## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**<br>　　　　　Plaintiff,<br>　v.<br><br>**SONNY PERDUE**, in his official capacity as Secretary of the United States Department of Agriculture,<br><br>　　　　and<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE**<br>　　　　　Defendants. | **Civ. No.** _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.　　　Plaintiff People for the Ethical Treatment of Animals ("PETA") challenges the U.S. Department of Agriculture's ("USDA") decisions to renew the Animal Welfare Act ("AWA") licenses of the five following applicants that exhibit animals at roadside facilities: (1) The Camel Farm in Yuma, Arizona; (2) Deer Haven Mini Zoo ("Deer Haven") in Keymar, Maryland; (3) Laughing Valley Ranch ("Laughing Valley") in Idaho Springs, Colorado; (4) Bayou Wildlife Park in Alvin, Texas; and (5) Henry Hampton operating Lazy 5 Ranch ("Lazy 5") in Mooresville, North Carolina, and The Farm at Walnut Creek ("Walnut Creek") in Sugarcreek, Ohio. Each of these applicants operates in violation of the AWA, and each holds an AWA license that the USDA recently renewed despite chronic violations of the Act.

2.　　　As part of the license renewal process, each of these five applicants was required to certify that they are "in compliance with the regulations and standards" of the AWA. 9 C.F.R. § 2.2(b). This self-certification, combined with the USDA's ability to inspect, *id.* § 2.3(a), is how the agency ensures that the applicant has "demonstrated that his facilities comply with" the AWA, which is required by the Act before a license can be issued. 7 U.S.C. § 2133.

3.      On information and belief, all five of these applicants certified their facilities were in compliance with the AWA as part of their renewal application, and as a result the USDA renewed their AWA licenses.

4.      At the time of renewal, however, the USDA actually knew or should have known with certainty, based on its own records, that the self-certifications of compliance with the AWA submitted by each of these five applicants was false.

5.      When the USDA renewed these licenses, the agency had ample evidence that all five of these applicants chronically subject animals to inhumane care and treatment in violation of the AWA. The USDA's own inspectors documented, and continue to document, the suffering of animals confined by these applicants to filthy, barren, unsafe enclosures, often without clean water, palatable food, protection from the elements, or adequate veterinary care—all in violation of the AWA. These agency reports show that these unlawful conditions existed at the time of renewal.

6.      The USDA, however, opted to renew these licenses despite evidence that these applicants' self-certifications were blatantly false, and that in all actuality these facilities were grossly and consistently out of compliance with the AWA. As such, the USDA's decisions to renew the AWA licenses for The Camel Farm, Deer Haven, Laughing Valley, Bayou Wildlife Park, and Henry Hampton (Lazy 5 and Walnut Creek) are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C), (D).

7.      These five licensing decisions were made pursuant to the USDA's pattern, practice, and policy of relying on applicants' self-certifications of compliance even when the

agency has demonstrable "smoking gun" evidence before it that those self-certifications are false. This pattern, practice, and policy is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observation of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C), (D).

8.      The D.C. Circuit in *Animal Legal Defense Fund v. Perdue* held that the USDA's renewal scheme, which relies on "self-certification **and** availability for inspection," was a "reasonable interpretation of the statutory demonstration requirement." 872 F.3d 602, 617-18 (D.C. Cir. 2017) (emphasis added). Yet, the USDA's implementation of this renewal scheme, as evidenced by these five decisions, relies entirely on self-certification.

9.      The USDA takes the position that when agency inspectors document a facility that is operating in flagrant violation of applicable AWA standards, that information is completely irrelevant to the agency's decision to renew the facility's AWA license each year. In other words, in the USDA's view, the mere fact that a facility makes itself "available for inspection" is sufficient for license renewal, regardless of the results of that inspection. This approach is not a reasonable or lawful interpretation of the mandate that no AWA license shall be issued "until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary" pursuant to the Act. 7 U.S.C. § 2133. As a result, the USDA's position, and the resulting licensing decisions, are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observation of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C), (D).

10.     The AWA's primary stated purpose is "to insure that animals used . . . for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131(1). By automatically granting—or rubberstamping—the license renewal applications of these five applicants, the USDA condemns hundreds of animals to suffer for years on end without the food, water, enrichment, or veterinary care to which they are entitled under the plain language of the AWA. The USDA's policy, pattern, and practice fails to ensure that animals are humanely treated.

11.     Moreover, by ensuring that facilities that are not in compliance with the applicable standards—like the five at issue in this Complaint—nevertheless remain "licensed" under the auspices of the AWA each year, the USDA's policy, pattern, and practice necessarily results in more licensed facilities, thereby diluting the USDA's ability to detect, address, and prevent violations of the AWA. For this additional reason, the USDA's policy is arbitrary and capricious within the meaning of the APA, 5 U.S.C. § 706(2)(A).

## JURISDICTION, VENUE, AND RELIEF

12.     This Court has jurisdiction over the subject matter of the Complaint pursuant to 28 U.S.C. § 1331 because this action constitutes a federal question under the APA, 5 U.S.C. §§ 551-801, and the AWA, 7 U.S.C. §§ 2131-59.

13.     Venue is proper in this Court under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

14.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Injunctive relief is authorized by Federal Rule of Civil Procedure 65 and the APA, 5 U.S.C. § 706.

## PARTIES

**<u>Plaintiff</u>**

15.     Plaintiff is a non-profit organization headquartered in Norfolk, Virginia, that is dedicated to protecting animals from abuse, neglect, and cruelty. PETA undertakes these efforts through, *inter alia*, public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, public education, and protest campaigns.

16.     To fulfill its mission, PETA spends substantial resources each year advocating on behalf of animals used for exhibition and entertainment. PETA solicits and investigates complaints about animal cruelty submitted by the public. PETA uses its website, publications, and the media to disseminate information to its members and the public about government actions affecting animals, including animals who are exhibited at roadside facilities like those at issue here. PETA routinely sends submissions to the government concerning the treatment of captive animals, and PETA responds to requests for public comment from the government concerning animal welfare issues. PETA's members also routinely comment on such matters.

17.     The USDA's decisions to renew the five particular licenses addressed in this Complaint pursuant to an unlawful policy, pattern, and practice of renewing AWA licenses when facilities are not in compliance with the AWA frustrates and is directly contrary to PETA's mission. By automatically renewing the licenses of applicants that are in violation of the AWA, specifically the applicants at issue here, the USDA allows the exhibition of animals under conditions that do not meet the minimum standards of care and treatment set forth under the AWA and are, by definition, inhumane. The USDA's illegal actions thus increase the number of animals that are exhibited under unlawful conditions and are subjected to inhumane care and treatment, and thereby compels PETA to spend more resources detecting, disclosing,

educating the public about, and bringing to the agency's attention, these non-compliant facilities.

18.     PETA has spent considerable resources monitoring the condition and status of the animals confined by The Camel Farm, Deer Haven, Laughing Valley, Bayou Wildlife Park, and Henry Hampton (Lazy 5 and Walnut Creek). PETA has used and will continue to use its website, publications, and the media to disseminate information about the animals held by these chronic AWA violators. PETA has advocated and will continue to advocate for action to address AWA violations at facilities and exhibitions run by these chronic AWA violators whose licenses are automatically renewed despite their violations. PETA has documented and assessed the conditions of the animals held by these chronic AWA violators, and will continue to do so. For example, in the past two years, PETA compiled and submitted several complaints to the USDA documenting violations of the AWA at facilities run by these chronic AWA violators. PETA also filed complaints with other federal, state, and local officials about other apparent violations of law committed by these chronic AWA violators. PETA is currently and will continue to undertake all of the above referenced actions with respect to The Camel Farm, Deer Haven, Laughing Valley, Bayou Wildlife Park, and Henry Hampton (Lazy 5 and Walnut Creek).

19.     PETA has been and will continue to be harmed by the USDA's decisions each year to renew the AWA licenses of The Camel Farm, Deer Haven, Laughing Valley, Bayou Wildlife Park, and Henry Hampton (Lazy 5 and Walnut Creek) despite chronic and ongoing violations of the AWA. By continuing to issue licenses to these applicants each year despite evidence that these applicants confine animals to conditions that violate the AWA, the USDA causes PETA to spend additional resources monitoring, documenting, and addressing the unlawful licensing decisions and the inhumane conditions at the applicants' facilities.

20.     The USDA's renewal of the AWA licenses of these chronic violators pursuant to

the agency's unlawful policy also causes PETA to spend additional resources educating the

public that despite the fact that these facilities are operating under the auspices of an official

USDA AWA "license," they are not complying with the AWA. Indeed, the USDA's illegal

policy and practice of renewing applications—pursuant to which the AWA licenses of the five

applicants at issue in this Complaint were renewed—creates the misperception among the

public, and especially parents and their children, that these facilities are treating the animals in

their possession lawfully and humanely. This misperception is further fueled by the fact that the

USDA continues to require applicants seeking renewal to certify their compliance with the

AWA, even though the agency renews licenses when those certifications are demonstrably false

and these entities are in violation of AWA standards at the time their licenses are renewed.

21.     As a result of the USDA's unlawful practices and decisions, PETA must divert

resources away from other animal protection projects in order to devote these resources to

combatting the USDA's violations of the AWA, combatting additional violations of the AWA

and other state, local, and federal laws by The Camel Farm, Deer Haven, Laughing Valley,

Bayou Wildlife Park, and Henry Hampton (Lazy 5 and Walnut Creek), and educating the public

about the unlawful and inhumane way in which the animals exhibited at these facilities are

being maintained.

22.     If it prevails in this action, PETA will no longer have to expend as many

resources addressing the USDA's failure to comply with the AWA, monitoring the unlawful and

inhumane conditions to which animals are confined by these chronic AWA violators, filing

complaints, and educating the public about these conditions and the fact that they violate the

AWA. Those resources would then be directed to other PETA projects, including efforts to

protect other animals used in entertainment, in furtherance of PETA's overall mission. Since

The Camel Farm, Deer Haven, Laughing Valley, Bayou Wildlife Park, and Henry Hampton

(Lazy 5 and Walnut Creek) would not be able to exhibit animals without a USDA license, they

would either have to improve conditions at their own facilities or relocate the animals to other

facilities that comply with the AWA. Either way, the applicants' animals would then be held in

conditions that are lawful and more humane and thus would not cause PETA to divert resources

to monitor the conditions of their confinement. PETA would then be able to devote these

resources to the furtherance of its mission, as described above.

**Defendants**

23.     Defendant Sonny Perdue is the Secretary of the USDA. As the Secretary for the

agency, Secretary Perdue is ultimately responsible for the USDA's decisions to issue license

renewals to chronic AWA violators, specifically The Camel Farm, Deer Haven, Laughing

Valley, Bayou Wildlife Park, and Henry Hampton (Lazy 5 and Walnut Creek), and for the

USDA's policy of rubber stamping renewal licenses pursuant to which these decisions were

made.

24.     Defendant the USDA is the agency responsible for administering the AWA and

ensuring the humane care and treatment of animals that are used for exhibition. The USDA is

the federal agency responsible for the policy, pattern, and practice of rubberstamping license

renewal applications, and for the decisions to renew the licenses of chronic AWA violators,

specifically The Camel Farm, Deer Haven, Laughing Valley, Bayou Wildlife Park, and Henry

Hampton (Lazy 5 and Walnut Creek).

## STATUTORY AND REGULATORY FRAMEWORK

I.     **The Animal Welfare Act Statutory Requirements**

25.     The primary stated purpose of the AWA is to "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1).

26.     To accomplish this goal, Congress directed the Secretary of Agriculture to promulgate standards for the "humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id*. § 2143(a)(1). These standards must include "minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, [and] adequate veterinary care." *Id.* § 2143(a)(2)(A). Additionally, for primates, these standards must also include provisions "for a physical environment adequate to promote the [animals'] psychological well-being." *Id.* § 2143(a)(2)(B). The USDA recognizes that these minimum standards are the baseline that is necessary for humane care and treatment required by the AWA, not the ideal standards, and encourages regulated entities to exceed these standards.

27.     To ensure that animals receive humane care and treatment, the AWA provides that the Secretary "shall issue licenses" to dealers and exhibitors, "*[p]rovided* that no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary" pursuant to the Act. *Id*. § 2133 (emphasis in original).

28.     Thus, the AWA prohibits the USDA from issuing licenses to entities that are unable to demonstrate compliance with applicable standards.

II.     **Animal Welfare Act Regulatory Requirements**

A.      **Licensing**

29.     Every AWA license bears an expiration date. Under the current regulations,

AWA licenses expire annually and must be renewed on or before this expiration date in order

for the facility to continue to be licensed. Thus, each AWA license "will expire and

automatically terminate" on its expiration date unless a licensee applies for and receives a

license renewal. 9 C.F.R. § 2.5(b). "A licensee who wishes a renewal must submit . . . a

completed application form . . . on or before the expiration date of the license." *Id*. § 2.1(d)(1).

This process must be repeated "[e]ach year" and renewal applications must be filed "within

30 days prior to the expiration date" of the license to avoid expiration and automatic

termination. *Id*. § 2.7(a).

30.     An applicant seeking to renew an AWA license must submit both "a completed

application form and the annual license fee." *Id*. § 2.1(d)(1). If the "required annual license fee"

is not "received in the appropriate Animal Care regional office on or before the expiration date

of the license," the license "will automatically terminate." *Id*. § 2.5(b).

31.     Dealers must also report their income from the sale of regulated animals in the

prior year and exhibitors must report the number of regulated animals owned, held, or exhibited

in the same period. *Id*. § 2.7(a)-(b), (d). Failure to comply with this annual reporting

requirement will also "result in automatic termination of the license." *Id*. § 2.5(b).

32.     Applicants for renewal, like applicants for an initial license, "must demonstrate"

compliance with the AWA. *Id*. § 2.3(a); *see also* 7 U.S.C. § 2133 ("no such license shall be

issued until the dealer or exhibitor shall have demonstrated that his facilities comply" with the

AWA); APHIS Form 7003 (Application for License Renewal, stating "No license may be issued

unless a completed application has been received (7 U.S.C. 2132-2143), and the applicant is in compliance with the standards and regulations Section 2133").

33.     Unlike applicants for an initial license who, according to the USDA regulation, "must be inspected" by the USDA to demonstrate compliance with the AWA, 9 C.F.R. § 2.3(b), renewal applicants are only required to make their "animals, premises, facilities, vehicles, equipment, other premises, and records *available* for inspection" for purposes of allowing the USDA to "ascertain the applicant's compliance" with the AWA. *Id*. at 2.3(a)(emphasis added).

34.     In practice, the USDA does not utilize inspections of renewal applicants' facilities to determine compliance with the AWA. Rather, the USDA relies solely on a renewal applicants' certification that "to the best of the applicant's knowledge and belief, he or she is in compliance with the regulations and standards" of the AWA. *Id*. § 2.2(b). This self-certification that purportedly demonstrates compliance with the AWA is simply the applicants' signature on the renewal application form. *Id*.

35.     This self-certification requirement is *not* intended as an "alternative means of ascertaining compliance" with the AWA. Animal Welfare: Licensing and Records, 60 Fed. Reg. 13893, 13894 (Mar. 15, 1995). Rather, facilities are subject to inspections during which the USDA can "ascertain the applicant's compliance with the [AWA] standards and regulations." *Id*.  The USDA inspects licensed facilities routinely to determine compliance with the AWA. 9 C.F.R. §§ 2.126; 2.3(a).

36.     Once issued, a license is "valid and effective" for one year unless it is "revoked or suspended," "voluntarily terminated," it "has expired or been terminated," or the "annual license fee has not been paid . . . as required." *Id*. § 2.5(a).

37.     A person whose license is revoked is permanently disqualified from becoming licensed again. *Id*. § 2.10(b). A person whose license is suspended may apply for reinstatement after the suspension period has expired. *Id*.

38.     In contrast, a person whose license is simply not renewed, for example because he failed to timely pay the renewal fee, is free to reapply for a license at any time.

### B.     Veterinary Care and Safe Handling Requirements

39.     The AWA regulations requiring veterinary care for and safe handling of animals maintained by licensees are set forth at 9 C.F.R. §§ 2.40 and 2.131. These regulations require exhibitors and dealers to develop and maintain a Program of Veterinary Care ("PVC") and to have "an attending veterinarian who shall provide adequate veterinary care" to the animals they maintain. *Id*. § 2.40.

40.     The regulations further specify that animals may be exhibited only "under conditions consistent with their good health and well-being." *Id*. § 2.131(d)(1). This includes alleviating "climactic conditions [that] present a threat to an animal's health or well-being." *Id*. § 2.131(e).

41.     During exhibition, the animals and the public must be separated by "sufficient distance and/or barriers . . . so as to assure the safety of" both. *Id*. § 2.131(c)(1). If the public is allowed contact with exhibited animals, a "responsible, knowledgeable, and readily identifiable employee or attendant must be present at all times during periods of public contact." *Id*. § 2.131(d)(2).

### C.     Minimum Standards for the Humane Handling, Care, and Treatment of Primates

42.     The AWA minimum standards for the humane handling, care, and treatment of primates are set forth at 9 C.F.R. §§ 3.75–3.92.

43.     These regulations require exhibitors and dealers to "develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates." *Id*. § 3.81. At minimum, these "Enhancement Plans" must "include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature." *Id*. § 3.81(a). These specific provisions "must be in accordance with currently accepted professional standards, as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." *Id*.

44.     Exceptions to this social housing requirement apply to overly aggressive or debilitated primates, who should be housed separately, and to those who "have or are suspected of having a contagious disease," who must be isolated from healthy animals "as directed by the attending veterinarian." *Id*. § 3.81(a)(1)-(a)(2). However, if housed individually, primates "must be able to see and hear nonhuman primates of their own or compatible species unless the attending veterinarian determines that it would endanger their health, safety, or well-being." *Id*. § 3.81(a)(3).

45.     The minimum standards for the care of primates further require housing facilities to be "structurally sound," "kept in good repair," and "readily cleaned and sanitized." *Id*. § 3.725(a), (c)(1). Primary enclosures must also be free of "sharp points or edges" and "must be enriched by providing means of expressing noninjurious species-typical activities." *Id*. §§ 3.80(a)(2)(i), 3.81(b). Environmental enrichments include "providing perches, swings, mirrors, and other increased cage complexities; providing objects to manipulate; varied food items; using foraging or task-oriented feeding methods; and providing interaction with the care giver . . . ." *Id.* § 3.81(b).

D. **Minimum Standards for the Humane Handling, Care, and Treatment of Other Animals**

46. The AWA minimum standards for the "humane handling, care, treatment, and transportation of warm-blooded animals other than dogs, cats, rabbits, hamsters, guinea pigs, nonhuman primates, and marine mammals" are set forth at 9 C.F.R. §§ 3.125–3.142.

47. The AWA minimum standards for the "humane handling, care, treatment, and transportation of dogs and cats" are set forth at 9 C.F.R. §§ 3.1-3.19.

E. **Facilities and Operating Standards**

48. Facilities housing warm-blooded animals "must be constructed of such material and of such strength as appropriate for the animals involved." *Id*. § 3.125(a); *see also id*. §§ 3.1(a), 3.75(a). They must also "be maintained in good repair to protect the animals from injury and to contain the animals." *Id*. § 3.125(a); *see also id*. §§ 3.1(a), 3.75(a). Enclosures must "provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement." *Id*. § 3.128; *see also id*. §§ 3.6(a)(2)(xi), 3.80(a)(2)(xi).

49. Outdoor facilities must provide both "sufficient shade" to prevent overheating or discomfort and shelter that is "appropriate to the local climatic conditions" and that affords the animals protection and prevents their discomfort. *Id*. § 3.127(a)-(b); *see also id*. §§ 3.4(b), 3.78(b). Outdoor facilities must also "be enclosed by a perimeter fence that is of sufficient height to keep animals and unauthorized persons out," and a "suitable method . . . to rapidly eliminate excess water" must be provided. *Id*. § 3.127(c)-(d); *see also id*. §§ 3.1(f), 3.75(f), 3.78(d)-(e).

50. Exhibitors and dealers must provide "for the removal and disposal of animal and food wastes, bedding, dead animals, trash and debris" and disposal must be done in such a

manner "as to minimize vermin infestation, odors, and disease hazards." *Id.* § 3.125(d); *see also id.* §§ 3.1(f), 3.75(f).

F.   **Minimum Health and Husbandry Standards**

51.   "[W]holesome food" and "potable water" must be provided in receptacles that are "kept clean and sanitary." 9 C.F.R. §§ 3.129(a)-(b), 3.130; *see also id.* §§ 3.9, 3.10, 3.82(a), 3.82(d), 3.83. Enclosures must also be kept sanitary, which requires the removal of excreta "as often as necessary to prevent contamination . . . and to minimize disease hazards and to reduce odors." *Id.* § 3.131(a); *see also id.* §§ 3.11, 3.84.

52.   The buildings and grounds must be "kept clean and in good repair in order to protect the animals from injury" and exhibitors must establish a "safe and effective program for the control of insects, ectoparasites, and avian and mammalian pests . . . ." *Id.* § 3.131(c)-(d).

53.   Additionally, exhibitors must provide a "sufficient number of adequately trained employees . . . to maintain the professionally acceptable level of husbandry" set forth under the AWA. *Id.* § 3.132; *see also id.* §§ 3.12, 3.85.

**FACTS GIVING RISE TO PLAINTIFF'S CLAIMS**

I.   **The USDA's Policy, Pattern, and Practice of Renewing AWA Licenses Based Solely on the Applicant's Self-Certification**

54.   The five renewal decisions challenged here were made pursuant to the USDA's policy, pattern, and practice of renewing AWA licenses based solely on an applicant's self-certification of compliance, despite the fact that the agency had demonstrable "smoking gun" evidence before it that this self-certification was false.

55.   The USDA renewed the five licenses addressed in this Complaint because the agency treats the renewal process for an AWA license as purely administrative. In other words, the USDA will renew an AWA license if a licensee (1) submits a renewal application, (2) pays

the annual license fee, (3) submits an annual report, and (4) signs the renewal application form thereby certifying compliance with the AWA regulations and standards. *See* 9 C.F.R. §§ 2.1(d)(1); 2.7; 2.2(b).

56.     So long as an applicant for renewal has submitted its application on time, paid the requisite fee, made the requisite "certification," and provided the requisite report, the USDA will renew the license, even if there is voluminous evidence before the agency demonstrating that the facility is operating in blatant violation of the AWA.

57.     The USDA does *not* take into account its own inspection reports—let alone information submitted to it by the general public or PETA—in deciding whether to grant the requested renewal of an AWA license.

58.     This policy, pattern, and practice is at odds with the USDA's position—which the D.C. Circuit upheld in *Animal Legal Defense Fund v. Perdue*, 872 at 617-18—that self-certification **combined** with the agency's ability to conduct random inspections is sufficient for a renewal applicant to demonstrate compliance with the AWA. The USDA's position in practice is that inspection results are irrelevant.

59.     The USDA's policy, pattern, and practice of relying on an applicant's self-certification of compliance with the AWA even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false results in decisions that are arbitrary, capricious, not in accordance with law, without observation of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations.

60.     There are thousands of facilities licensed under the AWA. These licenses—including the five at issue in this Complaint—are renewed annually. Provided that the USDA continues to administratively renew AWA licenses based solely on an applicant's self-

certification of compliance, there is a cognizable risk that the agency will arbitrarily grant a license to a facility that the USDA knows—based on the agency's own inspection reports—is out of compliance with the AWA. In light of the short duration of these AWA licenses, combined with the sheer number of licenses renewed each year, it is reasonably likely that the arbitrary and capricious decision making that is evident with the five licenses at issue in this Complaint will continue.

**II.    The USDA's Decisions to Renew Five Particular AWA Licenses Despite Evidence of Non-Compliance with the Act.**

61.    Between August 2017 and January 2018, the USDA renewed the AWA licenses for (1) The Camel Farm, (2) Deer Haven, (3) Laughing Valley, (4) Bayou Wildlife Park, and (5) Henry Hampton (Lazy 5 and Walnut Creek). Each of these applicants operates in violation of the AWA, and each holds an AWA license that the USDA recently and unlawfully renewed.

**A.    The Camel Farm's False Certification of Compliance**

62.    Terrill Al-Saihati, doing business as "The Camel Farm," holds AWA exhibitor's license number 86-C-0102 and is located in Yuma, Arizona.

63.    The Camel Farm routinely violates the AWA.

64.    The Camel Farm's license was due to expire on December 6, 2017.

65.    On information and belief, on or before December 6, 2017, Terrill Al-Saihati applied for a license renewal by reporting the number of animals held, paying a small fee, and certifying compliance with the AWA.

66.    On or before December 6, 2017, when Terrill Al-Saihati certified that The Camel Farm was in compliance with the AWA, the USDA had actual knowledge that this self-certification was false.

67.     Between March 7, 2017, and November 8, 2017, USDA inspectors cited The Camel Farm for thirty-three (33) violations of minimum standards under the AWA designed to ensure the humane care and treatment of exhibited animals, including twenty-eight (28) repeat violations and six (6) direct violations. Direct violations are those that, at the time of the inspection, are seriously and/or severely adversely impacting an animal's health or wellbeing, or are likely to have that effect in the immediate future. During this time period, inspectors documented the facility's repeated failure to provide for the animals' most basic requirements, including failing to detect, report, and treat painful ailments. At almost every inspection during this time period, the USDA cited The Camel Farm because numerous animals were in need of veterinary care, such as goats who couldn't stand or walk normally; animals with wounds, hair loss, and growths; and twenty-four (24) animals with overgrown hooves—an ailment that can be extremely painful, cause foot infections, abscesses, and lameness, and, if chronic, can be the basis for the USDA to confiscate the animals. The agency also documented the facility's repeated failure to provide animals with clean water, sanitary enclosures, adequate shade, and to keep numerous enclosures and the perimeter fence in good repair.

68.     For example, The Camel Farm was repeatedly cited throughout 2017 for not providing adequate veterinary care to a goat who has been non-weight bearing on the right front leg for over a year. On May 23, 2017, a USDA inspector cited the facility for a direct violation of the AWA for injecting the injured goat with an oral pain medication that was "prescribed for a coati and not intended to be used on the goat." The USDA also cited The Camel Farm twice— both immediately before and after the license renewal—for failing to follow veterinary recommendations to either conduct further diagnostic work or to euthanize the ailing goat because of his condition.

69.     Another egregious example of The Camel Farm's AWA violations occurred on March 7, 2017, when the USDA issued a repeat direct citation to the facility for failing to provide adequate veterinary care to a coatimundi whose left eye was "protruding and extremely swollen, approximately the size of a golf ball."  This issue had previously been cited on November 15, 2016, as a direct violation of the AWA, when the facility commented that "the eye looks better since it exploded." The inspector noted that the eye had significantly worsened in severity since the previous inspection. While the coatimundi was seen by a veterinarian after the November 2016 citation and given treatment, the facility ceased giving the prescribed treatment in January 2017. Instead, the animal manager stated that he attempted to "pop" the protruding eye back in on his own. The USDA inspector found that the delay in follow-up veterinary care "resulted in unnecessary pain and suffering" and that the unapproved "care" caused "unnecessary distress and contributed to worsening of the condition."

70.     In addition to reports from its own inspectors, the USDA received several submissions from PETA documenting violations of the AWA by The Camel Farm. On November 9, 2017—just one month prior to the facility's license renewal—PETA submitted a complaint to the USDA conveying photographic evidence from a visitor who observed and documented a camel with swollen legs in need of veterinary care, as well as muddy enclosures and inadequate shelter for many animals.

71.     Less than a month later, PETA sent another letter to the USDA compiling the countless AWA violations from the past year, as well as the more than one hundred (100) citations from the past five years, urging the agency not to renew The Camel Farm's AWA license.

72.     Nevertheless, on or about December 6, 2017, just one month after citing the facility for four (4) repeat violations, including nineteen (19) animals in need of veterinary care, the USDA renewed The Camel Farm's exhibitor's license pursuant to its illegal policy, pattern, and practice of relying on an applicant's self-certification of compliance with the AWA even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false.

73.     Just one month after the USDA renewed The Camel Farm's license, PETA again submitted a complaint to the USDA conveying evidence from another visitor who documented multiple animals in need of veterinary care, including the goat who had been limping since March of 2017, as well as muddy enclosures and inadequate shelters.

74.     Shortly thereafter, on February 6, 2018, the USDA cited The Camel Farm for eleven (11) AWA violations, including two direct violations and eight (8) repeat violations that had been occurring since before the license was renewed. These violations included failing to provide veterinary care to a sheep who was "excessively thin, with protruding hip bones, spine, and ribs," and failing to provide water to a lactating camel—who was with her nursing baby— who drank for "approximately 8 minutes" after being provided water. Two weeks later, the USDA cited the facility yet again for a direct, repeat violation for failing to provide several animals with adequate veterinary care.

75.     Terrill Al-Saihati deprives animals of adequate veterinary care and maintains them in unsafe and unsanitary conditions in violation of the AWA. These violations were documented by the USDA both *before* and *after* the agency's most recent renewal decision. As demonstrated by the evidence described in paragraphs 62-74, Terrill Al-Saihati's certification that The Camel Farm was in compliance with the AWA was blatantly false.

76.     When the USDA decided to issue The Camel Farm a license renewal, the agency

was well aware of the evidence described in paragraphs 62-74. The USDA knew that The

Camel Farm had routinely violated the AWA standards prior to and during the application

period. As a result, The USDA's decision to renew The Camel Farm's exhibitor's license,

despite having actual knowledge that the facility's self-certification of compliance with the

AWA was demonstrably false, was arbitrary, capricious, an abuse of discretion, not in

accordance with law, without observance of procedure required by law, and in excess of

statutory jurisdiction, authority, or limitations.

**B.     Deer Haven Mini Zoo's False Certification of Compliance**

77.     Deer Haven holds AWA exhibitor's license number 51-C-0111 and is located in

Keymar, Maryland.

78.     Deer Haven routinely violates the AWA.

79.     Deer Haven's license was due to expire on January 14, 2018.

80.     On information and belief, on or before January 14, 2018, Deer Haven applied

for a license renewal by reporting the number of animals held, paying a small fee, and certifying

compliance with the AWA.

81.     On or before January 14, 2018, when Deer Haven certified the facility was in

compliance with the AWA, the USDA had actual knowledge that this self-certification was

false.

82.     Between January 18, 2017, and October 26, 2017, USDA inspectors cited Deer

Haven Mini Zoo for seventy-seven (77) violations of minimum standards under the AWA

designed to ensure the humane care and treatment of exhibited animals, including sixty-seven

(67) repeat violations and (3) direct violations. During this time period, inspectors documented

the facility's repeated failure to provide the animals' basic requirements, including adequate

veterinary care. Many of these citations were initially observed during the previous (2016) renewal period and continued, unabated, into and throughout 2017.

83.      During this time period, inspectors documented the facility's repeated failure to provide animals with sanitary enclosures, failure to have an effective rodent-control program, and failure to keep numerous enclosures in good repair so as to prevent injury to the animals or escape. Based on the "non-compliant items related to cleaning, sanitation, waste disposal and maintenance," inspectors concluded that Deer Haven lacked a sufficient number of adequately trained employees to provide the level of care required under the AWA. In fact, Deer Haven has been cited for having an insufficient number of employees to adequately perform all of the husbandry responsibilities of the facility at every inspection since August 29, 2016.

84.      Deer Haven has numerous citations for depriving animals of adequate veterinary care. For example, on January 19, 2017, the USDA cited Deer Haven for a direct violation of the AWA for failing to provide a lethargic coatimundi who had "labored breathing, and [was] poorly responsive to stimuli" with veterinary care for about three months. Less than two weeks later, when the USDA returned to re-inspect the animal, the coatimundi was not present and "[t]he owner declined to provide the information on the [animal's] disposition." Deer Haven was repeatedly cited for failing to disclose the disposition of this coatimundi throughout 2017. The USDA inspectors have cited Deer Haven for failing to provide acquisition and disposition records for numerous other animals including a Patagonian cavy, six (6) artic fox kits, a potbelly pig, two prairie dogs, an alpaca, and two Jacob's sheep.

85.      On January 19, 2017, Deer Haven was also cited for killing an injured deer "by gunshot without consulting the attending veterinarian for guidance regarding veterinary care." Deer Haven was similarly cited on October 12, 2016, for not providing a deer with adequate

veterinary care after being "gored by a buck" resulting in "an abdominal wound with

evisceration." Deer Haven did not seek veterinary care and the gored deer died five days later.

The USDA cited Deer Haven for failing to provide adequate veterinary care explaining that the

deer "likely suffered extreme pain and distress over the five day period before its death."

86.     In addition to reports from its own inspectors, the USDA received submissions

from PETA documenting unlawful conditions at Deer Haven. On May 25, 2017, PETA

submitted a complaint to the USDA providing evidence from PETA's wildlife veterinarian, who

observed and took videos of multiple animals in need of veterinary care, including animals with

overgrown hooves and animals with irritated skin. PETA's wildlife veterinarian also observed

and took video of animals exhibiting abnormal behaviors—a sign of physiological stress.

Approximately six months later, PETA submitted another complaint to the USDA providing

documentation from a visitor who observed, photographed, and took videos of an alpaca with

severely overgrown nails, multiple animals without potable water and adequate shelter, dirty

cages, rat holes and mud in many enclosures, animals exhibiting abnormal behaviors, and a

decaying bird near one of the enclosures.

87.     Nevertheless, on or about January 14, 2018, after issuing the facility seven (7)

repeat citations at the prior inspection, the USDA renewed Deer Haven's exhibitor's license

pursuant to its illegal policy, pattern, and practice of relying on an applicant's self-certification

of compliance with the AWA even when the agency has demonstrable "smoking gun" evidence

before it that the self-certification is false.

88.     Just three days after the USDA renewed Deer Haven's license, PETA submitted

an urgent complaint to the USDA conveying evidence from another visitor who documented

multiple animals without potable water. Numerous water bowls were completely frozen over

and some appeared to have no water at all. Other cages had excessive and old feces and the caging appeared unsafe, a reoccurring problem at Deer Haven.

89.     A mere two weeks after the USDA renewed Deer Haven's license, on January 30, 2018, the USDA issued seven (7) citations to the facility, six (6) of which were repeat violations that existed *before* the license was renewed. All of these violations involved unsanitary and unsafe conditions, and an inadequate number of employees to care for the animals.

90.     Deer Haven maintains animals in unsanitary and unsafe conditions and deprives them of adequate veterinary care in violation of the AWA. This was documented by the USDA *before* and *after* the agency's most recent renewal decision. As demonstrated by the evidence described in paragraphs 77-89, Deer Haven's self-certification that it was in compliance with the AWA was blatantly false.

91.     When the USDA decided to issue Deer Haven a license renewal, the agency was well aware of the evidence described in paragraphs 77-89. The USDA knew that Deer Haven had routinely violated the AWA prior to and during the application period. As a result, the USDA's decision to renew Deer Haven's exhibitor's license, despite having actual knowledge that the facility's self-certification of compliance with the AWA was demonstrably false, was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations.

C.     **Laughing Valley's False Certification of Compliance**

92.     William B. Lee III, doing business as "Laughing Valley Ranch" operates under exhibitor's license number 84-C-0088 and is located in Idaho Springs, Colorado.

93.     Laughing Valley routinely violates the AWA.

94.     Laughing Valley's license was due to expire on December 20, 2017.

95.     On information and belief, on or before December 20, 2017, Laughing Valley

applied for a license renewal by reporting the number of animals held, paying a small fee, and

certifying compliance with the AWA.

96.     On or before December 20, 2017, when William B. Lee III certified Laughing

Valley was in compliance with the AWA, the USDA had actual knowledge that this self-

certification was false.

97.     Between February 22, 2017, and December 11, 2017, the USDA inspectors cited

William B. Lee III for twelve (12) violations of the minimum AWA standards, including nine

(9) repeat violations. Laughing Valley was cited for refusing the USDA inspectors access to the

facility and violating the minimum standards set forth under the AWA to ensure the humane

care and treatment of exhibited animals. Inspectors documented the facility's repeated failure to

provide the animals with adequate veterinary care, adequate shelter, clean water receptacles, and

safe enclosures. Inspectors also documented the facility's repeated failure to provide a written

PVC and acquisition and disposition records for both on-site and off-site traveling animal

exhibits.

98.     Laughing Valley has been repeatedly cited throughout the renewal period for

denying inspectors access to the facility. Four attempted inspections occurred on February 22,

2017, May 3, 2017, October 3, 2017, and December 11, 2017. For three of these attempts, Mr.

Lee spoke with and refused to allow the USDA inspectors access, in violation of the AWA. On

the fourth attempt, Mr. Lee was not available for an inspection as required by the AWA and its

implementing standards and could not be reached by phone. Since 2012, Laughing Valley has

been cited at least ten (10) other times for denying the USDA inspectors access to the facility.

Five of these citations occurred consecutively from April 7, 2015 to June 13, 2016, without any

inspections able to be conducted. It took over a year of attempted inspections before the USDA

was finally able to enter the property, at which point inspectors cited the facility for six (6)

violations of the AWA, including failing to provide veterinary care to five llamas, four sheep

and a goat who were all heavily matted, failing to provide adequate shelter to goats and llamas,

and failing to maintain appropriate acquisition and disposition records. Because access for

inspections is necessary to assess compliance with the AWA's minimum standards, inspection

refusals and situations where the agency has been unable to inspect the facility for a significant

period because of chronic unavailability for inspection are considered critical violations by the

USDA.

99.     When the USDA was finally able to inspect the facility over the course of this

past year, Laughing Valley was cited for not providing animals adequate veterinary care and not

having appropriate acquisition and disposition records for the animals. On July 19, 2017, the

USDA found two alpacas and a goat with "excessively overgrown hooves" such that "[t]he toes

on both alpacas [were] curling in outward directions." On October 7, 2017, the USDA cited the

facility for not having records on a llama, alpaca, three sheep, three goats and a steer who were

being exhibited out-of-state. The facility was also cited twice because it did not have a written

PVC.

100.    In addition, the USDA filed a complaint against Mr. Lee on December 6, 2013 for

over one hundred (100) alleged violations of the AWA. These violations included failure to

provide the USDA inspectors access to the facility, failure to keep the facilities in good repair,

and failure to provide adequate veterinary care to several animals, such as a female reindeer who

"was observed to be lying down and reluctant to rise, and had heavy, rapid breathing, a hunched

posture, thin body condition, and a tentative, slow gait." This reindeer was later euthanized after

being seized by local authorities. On information and belief, this complaint is still pending and has not yet been resolved.

101.    In 2012, state officials seized over one hundred (100) animals from Laughing Valley because of concerns about their living conditions. This led to Mr. Lee being charged with thirty-two (32) counts of misdemeanor animal cruelty. Through a plea deal, Mr. Lee agreed to plead guilty to one count of animal cruelty and two years of probation.

102.    Nevertheless, on or about December 20, 2017, the USDA renewed William B. Lee III's exhibitor's license for Laughing Valley pursuant to its illegal policy, pattern, and practice of relying on an applicant's self-certification of compliance with the AWA even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false.

103.    Less than three months after renewing Laughing Valley's license, on March 1, 2018, the USDA cited the facility for five (5) violations, including three (3) repeat violations for conditions that had existed before the license was renewed and persisted. Multiple animals were in need of veterinary care, including four alpacas with overgrown hooves "curling in a sideways direction," a sheep with a matted coat that needed shearing, and a goat with poor body condition and protruding bones. Inspectors also cited him for inaccurate disposition and acquisition records, numerous unsafe enclosures in various states of disrepair, inadequate shelter for a steer, and an enclosure with excess feces covering half of it.

104.    Laughing Valley deprives animals of adequate veterinary care, maintains them in unsafe and unsanitary conditions, and denies inspectors access to the facility in violation of the AWA. This was documented by the USDA *before* and *after* the agency's most recent renewal decision. As demonstrated by the evidence described in paragraphs 92-103, William B. Lee III's certification that Laughing Valley was in compliance with the AWA was false.

105.    When the USDA decided to issue Laughing Valley a license renewal, the agency was well aware of the evidence described in paragraphs 92-103. The USDA knew that Laughing Valley had routinely violated the husbandry standards of the AWA prior to and during the application period. As a result, the USDA's decision to renew Laughing Valley's exhibitor's license despite having actual knowledge that the facility's self-certification of compliance with the AWA was demonstrably false, was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations.

### D.    **Bayou Wildlife Park's False Certification of Compliance**

106.    Clinton Wolston III, doing business as "Bayou Wildlife Park," also known as Bayou Wildlife Zoo, holds AWA exhibitor's license number 74-C-0153 and is located in Alvin, Texas.

107.    Bayou Wildlife Park routinely violates the AWA.

108.    Bayou Wildlife Park's license was due to expire on December 29, 2017.

109.    On information and belief, on or before December 29, 2017, Clinton Wolston III applied for a license renewal by reporting the number of animals held, paying a small fee, and certifying compliance with the AWA.

110.    On or before December 29, 2017, when Clinton Wolston III certified Bayou Wildlife Park was in compliance with the AWA, the USDA had actual knowledge that this self-certification was false.

111.    Between April 7, 2017, and October 24, 2017, the USDA inspectors cited Bayou Wildlife Park for forty-two (42) violations of the minimum AWA standards, including nineteen (19) repeat violations and five (5) direct violations. During this time period, inspectors documented the facility's repeated failure to provide the animals' basic requirements, including

failing to detect, report, and treat painful ailments. During this time period, the USDA cited

Bayou Wildlife Park for repeatedly failing to provide numerous animals with potable water,

failing to have adequate barriers between the public and animals, failing to provide sanitary

enclosures, and failing to keep numerous enclosures in good repair so as to prevent injury to the

animals.

112.     In particular, on August 3, 2017, the facility was cited for nineteen (19)

violations, including one direct repeat violation for animals who "were exhibiting symptoms

indicative of compromised health" and needed to be "examined by a veterinarian."  The animals

needing veterinary care included a ram who was "ambulating on the knees" and had overgrown

hooves, a twenty-year-old beefalo cow who "was dorsally recumbent in an open pasture" with

"hook bones visible, prominent spine, some visible ribs and scarce body fat," and a waterbuck

who was found in poor body condition with visible bones. The USDA inspectors noted that

though many of these problems had been identified by the facility weeks earlier, they "were not

communicated to an attending veterinarian." Five days later, when the USDA returned for a

follow-up inspection, the beefalo cow and waterbuck were dead, never having been seen by a

veterinarian.

113.     Inspections throughout 2017 continued to document multiple, often repeat,

violations for animals in need of veterinary care, including numerous animals with excessively

overgrown hooves, two pigs who struggled to stand, and more animals who died of unknown

causes. During one inspection in October 2017, the USDA cited the facility for a critical repeat

violation of the AWA because a kangaroo, a Bennet Wallaby, a miniature horse, a deer, and a

sheep were found deceased within a three-week period and "[t]he attending veterinarian was not

notified about any of these animal deaths, **nor does the licensee know how the animals died**."
(emphasis added).

114.    In August 2017, Bayou Wildlife Park was also cited for the failure to adequately
clean animal areas including the shelter for the lemurs, which had a "buildup of debris coming
out of the rotted edges of the shelter." In fact, several animal areas within the park had an
"excess of ten feet wide and several feet thick of what appeared to be excreta and used hay."

115.    In addition to reports from its own inspectors, PETA submitted a complaint to
the USDA just fourteen days prior to Bayou Wildlife Park's license renewal, on December 15,
2017. PETA's complaint provided evidence from a visitor who observed, photographed, and
took videos of numerous animals in need of veterinary care, including animals with excessively
overgrown hooves and a sheep who appeared to have difficulty walking. The visitor also
observed, photographed, and took videos of cages in disrepair, animals forced to live in flooded
and muddy conditions, and animals' food that was covered in mud.

116.    Shortly thereafter, PETA sent another letter to the USDA compiling the more
than fifty (50) AWA violations Bayou Wildlife Park had committed during the past year, and
urging the agency not to renew the facility's AWA license.

117.    Nevertheless, on or about December 29, 2017, approximately two months after
citing the facility for seven (7) repeat violations—including for failing to provide adequate
veterinary care to the sheep who was *still* ambulating on the knees and had overgrown hooves
and because six animals had died of unknown causes—the USDA renewed Bayou Wildlife
Park's exhibitor's license pursuant to its illegal policy, pattern, and practice of relying on an
applicant's self-certification of compliance with the AWA even when the agency has
demonstrable "smoking gun" evidence before it that the self-certification is false.

118.     Two months later, on February 28, 2018, the USDA issued eleven (11) citations, including one direct repeat citation, to Bayou Wildlife Park, all of which were repeat violations of conditions that existed *before* the license was renewed. The violations involved numerous animals in need of veterinary care, including the sheep who "continue[d] to be unable to use either front foot/leg in a normal manner when walking" and had overgrown hooves. At least nine other animals had excessively overgrown hooves and two of those struggled to walk. Six more animals—a kangaroo, a giraffe, two eland, a lemur, and a watusi—died of unknown causes. The USDA again cited the facility because "[t]he attending veterinarian was not notified about any of these animal deaths, nor does the licensee know how the animals died." Additional repeat violations included unpotable water for numerous animals, inadequate barriers and lack of attendants, unsanitary and unsafe conditions, and continued inadequate staffing to care for the animals.

119.     On March 28, 2018, the USDA again cited the facility for the deaths of at least twenty (20) addition animals, including a newborn deer and a newborn bison who were both eaten by buzzards. Again, the USDA cited the facility because "[t]he attending veterinarian was not notified about any of these animal deaths, nor does the licensee know how the animals died." Other violations from this inspection included failure to provide adequate veterinary care to multiple animals and failure to maintain appropriate acquisition and disposition records.

120.     Bayou Wildlife Park deprives animals of adequate veterinary care and maintains them in unsanitary and unsafe conditions in violation of the AWA. This was documented by the USDA *before* and *after* the agency's most recent renewal decision. As demonstrated by the evidence described in paragraphs 106-119, Clinton Wolston III's certification that Bayou Wildlife Park was in compliance with the AWA was blatantly false.

121.     When the USDA decided to issue Bayou Wildlife Park a license renewal, the agency was well aware of the evidence described in paragraphs 106-119. The USDA knew that Bayou Wildlife Park had routinely violated the husbandry standards of the AWA prior to and during the application period. As a result, The USDA's decision to renew Bayou Wildlife Park's exhibitor's license, despite having actual knowledge that the facility's self-certification of compliance with the AWA was demonstrably false, was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations.

### E.     Henry Hampton's False Certification of Compliance at Lazy 5 Ranch and The Farm at Walnut Creek

122.     Henry Hampton holds AWA dealer's license number 55-B-0069 and exhibits animals at Lazy 5 Ranch in Mooresville, North Carolina, and The Farm at Walnut Creek in Sugarcreek, Ohio.

123.     Hampton routinely violates the AWA.

124.     Hampton's license was due to expire on August 13, 2017.

125.     On information and belief, on or before August 13, 2017, Hampton applied for a license renewal by reporting the amount of money he collected from the sale of animals in the prior year, paying a small fee, and certifying compliance with the AWA.

126.     On or before August 13, 2017, when Hampton certified Lazy 5 and Walnut Creek were in compliance with the AWA, the USDA had actual knowledge that this self-certification was false.

### i.     *Walnut Creek*

127.     Between November 14, 2016, and May 22, 2017, the USDA cited Hampton for fourteen (14) violations of the AWA at Walnut Creek including one direct violation. Almost all

of them were repeat violations. Hampton lacked an adequate PVC, which included inadequate methods to prevent, control, diagnose, and treat disease, and inappropriate methods for chemical restraint. "Unattended public contact" also continued "to be a problem at this facility and has been documented on many previous inspections." Additional violations included an inadequate enclosure to contain ring-tailed lemurs, which resulted in the disappearance of one, and rodent holes in a kangaroo shelter.

128.    At every inspection, Hampton was cited for deficiencies in his PVC. In particular, Hampton's PVC continued "to authorize the use of succinylcholine as the primary drug for tranquilization." The USDA explained that "[s]uccinylcholine is a paralytic agent" with no pain relieving or tranquilizing properties. Since the drug does not "alter conscious awareness," the USDA considers its use for "routine non-painful procedures" to be "distressful to the animals" and thus it "is not considered to be adequate veterinary care." Moreover, since the "drug can also paralyze respiratory muscles" and cause animals to stop breathing, its use creates a risk that animals "can die of suffocation while they remain conscious." Hampton has been cited for authorizing the use of this drug repeatedly since at least April 20, 2015.

129.    In addition, Hampton's PVC did not provide guidance "regarding the use of diagnostic testing, dewormers, vaccinations, and other methods to prevent, control, diagnose, and treat disease, including both internal and external parasites." Guidance on doses and methods of administration were also lacking. Inspectors stated that the lack of guidance on these topics "does not ensure welfare of the animals maintained by the facility as miscommunications may lead to failure to provide measures for prevention, control, and treatment of disease." This same violation for deficiencies in the PVC had been ongoing for years.

130.     Inspectors documented the facility's lack of barriers between numerous animals and the public, with no signs to discourage public contact, and no attendants present in any of the walk through or drive through areas of the zoo "to assure the safety of the animals and the public." Hampton has been consistently cited for this issue for years, dating back to at least June 12, 2013.

131.     Nevertheless, on or about August 13, 2017, the USDA perfunctorily renewed Hampton's dealer's license pursuant to its illegal policy, pattern, and practice of relying on an applicant's self-certification of compliance with the AWA even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false.

132.     On September 6, 2017, less than one month after the USDA renewed Hampton's AWA license, inspectors documented the same four (4) repeat violations of the Act at Walnut Creek. All were repeat violations from *before* his license was renewed that remained uncorrected. Hampton was still authorizing the use of a drug that had "distressing effects, narrow safety margin, and associated risk of mortality;" the PVC still lacked guidance on methods to prevent, control, diagnose, and treat disease; and he still lacked adequate barriers and attendants to safely protect the animals and the public. The most recent USDA inspection, March 26, 2018, demonstrates that most of these issues persist.

133.     Hampton deprives animals of adequate veterinary care and maintains them in unsafe and unsanitary conditions in violation of the AWA. This was documented by the USDA *before* and *after* the agency's most recent renewal decision. As demonstrated by the evidence described in paragraphs 127-132, Hampton's certification that Walnut Creek was in compliance with the AWA was blatantly false.

134.    When the USDA decided to issue Hampton a license renewal for Walnut Creek, the agency was well aware of the evidence described in paragraphs 127-132. The USDA knew that Walnut Creek had routinely violated the husbandry standards of the AWA prior to and during the application period. As a result, the USDA's decision to renew Hampton's license for Walnut Creek, despite having actual knowledge that the facility's self-certification of compliance with the AWA was demonstrably false, was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations.

### ii.    *Lazy 5*

135.    On March 21, 2017, the USDA inspectors cited Hampton for three (3) repeat violations of the AWA at Lazy 5. Similar to Walnut Creek, violations included approving the use of succinylcholine as the sole drug to immobilize hoofstock species without requiring the use of an anesthetic or analgesic and without providing for monitoring and "supportive care" required to detect and address respiratory distress, and the lack of sufficient barriers and attendants throughout the facility's drive through and walk through areas.

136.    On May 23, 2017, the USDA inspectors cited Hampton again for the same three (3) repeat violations of the AWA as they had during the previous inspection at Lazy 5. Inspectors also found an additional five (5) more violations, two of which were direct violations, including numerous animals in need of veterinary care who were limping and/or had recent wounds, incomplete inventory records, lemurs who were at risk of injury from a plugged-in electrical cord, and multiple animals who did not have adequate shelter.

137.    In addition to reports from its own inspectors, the USDA received multiple submissions from PETA documenting unlawful conditions at Lazy 5 Ranch. On January 13,

2017, PETA submitted a complaint to the USDA documenting concerns from a visitor who observed and photographed unsupervised contact between the animals and the public throughout the facility. In addition, PETA submitted numerous photos and videos posted on social media that showed apparent unattended and potentially dangerous interactions between the animals and the public. PETA sent the USDA two more complaints on April 13, 2017, and June 22, 2017, with additional videos and photographs of apparent rampant unattended feeding and contact between the animals and the public, including feeding animals from moving vehicles and getting out of vehicles in the drive through area.

138.    On July 31, 2017, less than two weeks before the USDA renewed Hampton's license, PETA again submitted a complaint documenting concerns from two visitors who observed and took video of a young camel in solitary confinement exhibiting abnormal behavior, indicating psychological distress, likely from inadequate conditions.

139.    Nevertheless, on or about August 13, 2017, the USDA perfunctorily renewed Hampton's dealer's license pursuant to its illegal policy, pattern, and practice of relying on an applicant's self-certification of compliance with the AWA even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false.

140.    On August 23, 2017, just ten days after the USDA renewed Hampton's license for Lazy 5, inspectors cited the facility for five (5) repeat violations of the AWA. Lazy 5 was cited for failure to provide adequate veterinary care to a giraffe with "overgrown, misshapen rear inside claws," and to a young lamb with a "left eye [that was] continually closed, [with an] abnormal outstretched head/neck posture, [who was] reluctan[t] to move, and [who had] evidence of diarrhea soiling on rear legs." Lazy 5 still lacked an adequate PVC for certain species, inventory records were still not complete, and there were still insufficient barriers and

attendants throughout the facility. While a new immobilizing drug had been used since the last

inspection, succinylcholine remained listed as the sole agent approved for capture, transport, and

chemical restraint in the PVC.

141.    On August 29, 2017, less than three weeks after the USDA renewed Hampton's

license for Lazy 5, PETA submitted a complaint with additional photographs and videos of

apparent rampant unattended feeding between the animals and the public and potentially

dangerous unattended interactions, including members of the public pushing on a bovine's head

and another pulling on a bovine's tongue.

142.    Several months later, in November 2017, at least five (5) waterbuck died from

suspected exposure to the cold at the facility. The USDA cited Lazy 5 for not providing

"adequate shelter from weather conditions that may impact their health."

143.    Hampton deprives animals of adequate veterinary care and maintains them in

unsafe and unsanitary conditions in violation of the AWA. This was documented by the USDA

*before* and *after* the agency's most recent renewal decision. As demonstrated by the evidence

described in paragraphs 135-142, Hampton's certification that Lazy 5 was in compliance with

the AWA was blatantly false.

144.    When the USDA decided to issue Hampton a license renewal for Lazy 5, the

agency was well aware of the evidence described in paragraphs 135-142. The USDA knew that

Lazy 5 had routinely violated the husbandry standards of the AWA prior to and during the

application period. As a result, the USDA's decision to renew Hampton's license for Lazy 5,

despite having actual knowledge that the facility's self-certification of compliance with the

AWA was demonstrably false, was arbitrary, capricious, an abuse of discretion, not in

accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations.

## FIRST CAUSE OF ACTION

145.    The USDA's policy, pattern, and practice of relying on an applicants' self-certification of compliance even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false, and its most recent decision taken pursuant to this policy to renew the license of The Camel Farm, despite the record before the agency showing that the facility was in violation of the AWA and its self-certification was false, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2)(A),  exceed the USDA's statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C), and are without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D).

146.    The USDA's unlawful actions injure Plaintiff in the manner specified in ¶¶ 15-22.

## SECOND CAUSE OF ACTION

147.    The USDA's policy, pattern, and practice of relying on an applicants' self-certification of compliance even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false, and its most recent decision taken pursuant to this policy to renew the license of Deer Haven, despite the record before the agency showing that the facility was in violation of the AWA and its self-certification was false, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2)(A), exceed the USDA's statutory jurisdiction and authority, within the

meaning of 5 U.S.C. § 706(2)(C), and are without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D).

148.     The USDA's unlawful actions injure Plaintiff in the manner specified in ¶¶ 15-22.

### THIRD CAUSE OF ACTION

149.     The USDA's policy, pattern, and practice of relying on an applicants' self-certification of compliance even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false, and its most recent decision taken pursuant to this policy to renew the license of Henry Hampton (Lazy 5 and Hampton Creek), despite the record before the agency showing that the facility was in violation of the AWA and its self-certification was false, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2)(A), exceeds the USDA's statutory jurisdiction and authority, within the meaning of 5 U.S.C. § 706(2)(C), and are without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D).

150.     The USDA's unlawful actions injure Plaintiff in the manner specified in ¶¶ 15-22.

### FOURTH CAUSE OF ACTION

151.     The USDA's policy, pattern, and practice of relying on an applicants' self-certification of compliance even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false, and its most recent decision taken pursuant to this policy to renew the license of Laughing Valley, despite the record before the agency showing that the facility was in violation of the AWA and its self-certification was false, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the

APA, 5 U.S.C. § 706(2)(A), exceeds the USDA's statutory jurisdiction and authority, within the meaning of 5 U.S.C. § 706(2)(C), and are without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D).

152.    The USDA's unlawful actions injure Plaintiff in the manner specified in ¶¶ 15-22.

## FIFTH CAUSE OF ACTION

153.    The USDA's policy, pattern, and practice of relying on an applicants' self-certification of compliance even when the agency has demonstrable "smoking gun" evidence before it that the self-certification is false, and its most recent decision taken pursuant to this policy to renew the license of Bayou Wildlife Park, despite the record before the agency showing that the facility was in violation of the AWA and its self-certification was false, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2)(A), exceeds the USDA's statutory jurisdiction and authority, within the meaning of 5 U.S.C. § 706(2)(C), and are without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D).

154.    The USDA's unlawful actions injure Plaintiff in the manner specified in ¶¶ 15-22.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

1.      Declare that Defendants acted arbitrarily, capriciously, not in accordance with law, abused their discretion, exceeded their statutory jurisdiction and authority, and did not observe procedures required by law in making their most recent decisions to renew the AWA

licenses of The Camel Farm, Deer Haven, Henry Hampton, Laughing Valley, and Bayou Wildlife Park.

    2.        Set aside as unlawful the USDA's most recent decisions to renew the licenses of The Camel Farm, Deer Haven, Henry Hampton, Laughing Valley, and Bayou Wildlife Park.

    3.        Declare that Defendants' policy of relying on an applicants' self-certification of compliance when the agency has demonstrable evidence before it that the self-certification is false, is arbitrary, capricious, not in accordance with law, an abuse of discretion, exceeds Defendants' statutory jurisdiction and authority, and is without observance of procedure required by law.

    4.        Award Plaintiff its reasonable attorneys' fees and costs; and

    5.        Grant such other and further relief as the Court may deem just and proper.


 Dated:  May 15, 2018                          Respectfully submitted,

                                              By: /s/ Delcianna Winders
                                              DC Bar No. 488056
                                              PETA Foundation
                                              1536 16th Avenue
                                              Washington, DC 20036
                                              Telephone:     (202) 309-4697
                                              Facsimile:     (202) 540-2208
                                              Email:         delciannaw@petaf.org

                                              *Counsel for Plaintiffs*