UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, <br><br> *Plaintiff,* <br><br> v. <br><br> KEVIN SHEA, Acting Secretary, U.S. Department of Agriculture, *et al.*, <br><br> *Defendants*. | Civil Action No. 18-1137 (TFH) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff People for the Ethical Treatment of Animals ("PETA") brings this action against Defendants Kevin Shea, Acting Secretary of Agriculture, and the U.S. Department of Agriculture ("USDA"), challenging four USDA renewal actions as "arbitrary and capricious" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in light of alleged "smoking gun" evidence of Animal Welfare Act ("AWA") violations. *See generally* 2d Am. Compl. (ECF No. 26). Due to the expiration or revocation of three of the challenged licenses since the filing of PETA's complaint, all but one of those challenges are now moot. As a result, PETA has moved for summary judgment with respect to its remaining challenge to the license renewal issued by USDA for Mr. Henry Hampton, who owns the Lazy 5 Ranch in Mooresville, North Carolina, and The Farm at Walnut Creek in Sugarcreek, Ohio. *See id.* ¶ 1; Pl.'s Mot. for Summ. J. (ECF No. 40).

There is no dispute that USDA's license renewal process has historically been purely administrative and does not require licensees to demonstrate AWA compliance. *See* Defs.

Renewed Mot. to Dismiss (ECF No. 12) at 3-4; Pl.'s Mem. In Support of Mot. for Summ. J. (ECF No. 40-1) at 18.  As this Court has previously noted, *see* Mem. Op. (ECF No. 22) at 17, the D.C. Circuit has followed other circuit courts in upholding USDA's administrative renewal scheme.  *See Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 618 (D.C. Cir. 2017) ("*ALDF*"). However, unlike those circuits, the D.C. Circuit has permitted plaintiffs to seek judicial review of whether USDA has engaged in "reasoned decisionmaking" in renewing a license in light of alleged "smoking gun" evidence in order to prevail in an APA challenge.  *Id.* at 620.

Due to the ministerial nature of USDA's renewal process, the agency relies on its inspection and enforcement proceedings to ensure compliance with AWA regulations.  PETA's motion does not quibble with this point; rather, PETA seeks to invalidate Hampton's license under the APA because, in its view, USDA ignored its own inspection reports and complaints submitted by PETA, and renewed Hampton's license despite his application being a day late. However, as discussed below, USDA's recent renewal of Hampton's license was reasonable under the circumstances.  First, after October 2018, USDA has inspected Hampton's two facilities a total of seven times and only confirmed one relatively minor noncompliance prior to USDA's most recent renewal of Hampton's license in August 2020.  While USDA cited Hampton's facilities in an inspection report issued around the same time as his license renewal, Hampton appealed that inspection report and the agency did not consider it to be final until October 2020, long after his license renewed.  Finally, USDA reasonably waived its timeliness requirements for USDA licensees—including Hampton—during the COVID-19 (coronavirus) pandemic due to significant disruptions to agency operations and to prevent potential harm to its regulated facilities.

For these reasons, USDA's renewal of Hampton in August 2020 was not arbitrary and

capricious nor otherwise inconsistent with law.  Accordingly, the Court should deny PETA's

motion for summary judgment and award summary judgment in favor of Defendants.

## BACKGROUND

**I.     THE STATUTORY AND REGULATORY SCHEME.**

### a.  The Animal Welfare Act.

The purpose of the Animal Welfare Act ("AWA") is "to insure that animals intended for

use in research facilities or for exhibition purposes or for use as pets are provided humane care

and treatment."  7 U.S.C. § 2131(1).  The AWA is limited to providing humane care and

treatment for animals in research facilities and on exhibition or for sale (*i.e.*, maintained by

exhibitors and dealers).

The AWA requires that dealers and exhibitors obtain a license from the Secretary and

that the license, once issued, is not "suspended or revoked," in order to operate as a dealer or

exhibitor.  7 U.S.C. § 2134.  The AWA also requires that "[t]he Secretary shall issue licenses to

dealers and exhibitors upon application therefor in such form and manner as he may prescribe

. . . *Provided*, That no such license shall be issued until the dealer or exhibitor shall have

demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant

to section 2143 of this title . . . ."  7 U.S.C. § 2133 (emphasis in original).  The AWA is silent as

to the expiration of an issued license or the need for renewal of an issued license.

The AWA does not expressly set forth the standards for providing humane care and

treatment for animals covered by the statute.  Rather, the AWA requires that "[t]he Secretary

shall promulgate standards to govern the humane handling, care, treatment, and transportation of

animals by dealers, research facilities, and exhibitors."  7 U.S.C. § 2143(a)(1).

Under the AWA "[t]he Secretary shall make such investigations or inspections as he

deems necessary to determine whether any dealer, exhibitor, intermediate handler, carrier,

3

research facility, or operator of an auction sale subject to section 2142 of this title, has violated or is violating any provision of this chapter or any regulation or standard issued thereunder . . . ." 7 U.S.C. § 2146(a). The AWA leaves enforcement to ensure continuing compliance with the statute in the sound discretion of the Secretary. *See id.* In addition, while the AWA requires that "[t]he Secretary shall inspect each research facility at least once each year," there is no corresponding annual inspection requirement for other covered entities such as exhibitors and dealers. *Id.*

Section 2149 of the AWA provides that the USDA "may" suspend or revoke an exhibitor's license if the exhibitor has violated or is violating the AWA or its implementing regulations. 7 U.S.C. § 2149(a). At the same time, if the USDA "has reason to believe" that a licensee is in violation of the AWA or its implementing regulations, the statute prescribes mandatory procedural protections prior to revocation or suspension. *Id.*

> If the Secretary has reason to believe that any person licensed as a dealer, exhibitor, or operator of an auction sale subject to section 2142 of this title, has violated or is violating any provision of this chapter, or any of the rules or regulations or standards promulgated by the Secretary hereunder, he may suspend such person's license temporarily, but not to exceed 21 days, and after notice and opportunity for hearing, may suspend for such additional period as he may specify, or revoke such license, if such violation is determined to have occurred.

*Id.* In addition, exclusive jurisdiction over judicial review of such enforcement actions is expressly reserved in the Court of Appeals:

> Any dealer, exhibitor, research facility, intermediate handler, carrier, or operator of an auction sale subject to section 2142 of this title, aggrieved by a final order of the Secretary issued pursuant to this section may, within 60 days after entry of such an order, seek review of such order in the appropriate United States Court of Appeals . . . and such court shall have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of the Secretary's order.

7 U.S.C. § 2149(c).

"The Secretary is authorized to promulgate such rules, regulations, and orders *as he may deem necessary* in order to effectuate the purposes of this chapter."  7 U.S.C. § 2151 (emphasis added).

###    b.  USDA's Regulations.

Pursuant to 7 U.S.C. § 2151, the USDA promulgated regulations in order to effectuate the purposes of the AWA.  *See* 9 C.F.R. Parts 1-4.[1]  The regulations promulgated by the USDA expressly distinguish between issuance of a license (*i.e*., "initial license") and renewal of an issued license.  *E.g.,* 9 C.F.R. § 2.2 (distinguishing between "Application for initial license" in subsection (a) and "Application for license renewal" in subsection (b)).  *See also* Animal Welfare Regulations, 54 Fed. Reg. 10835-01, 10838, 1989 WL 277822 (March 15, 1989) ("We have made conforming changes throughout Subpart A to differentiate between new license applications and license renewals.").  The regulations require that "[e]ach applicant for an *initial license* must be inspected by APHIS [the Animal and Plant Health Inspection Service] and demonstrate compliance with the regulations and standards . . . *before APHIS will issue a license*."  9 C.F.R. § 2.3(b) (emphasis added).  There is no corresponding requirement for a

---

[1]     Defendants note that all citations to USDA's regulations below refer to USDA's regulations prior to the 2020 update described *supra*.

demonstration of compliance prior to renewal contained in the regulations.  *Compare* 9 C.F.R. §

2.3(a).[2]

Once a license is issued under the AWA, the issued license "shall be valid and effective

unless:"

> (1) The license has been revoked or suspended pursuant to section 19 of the Act.
>
> (2) The license is voluntarily terminated upon request of the licensee, in writing, to the AC Regional Director.
>
> (3) The license has expired or been terminated under this part.
>
> (4) The annual license fee has not been paid to the appropriate Animal Care regional office as required.

9 C.F.R. § 2.5(a).  Accordingly, a license issued under the AWA remains valid and issued unless

and until one of the enumerated triggering events occurs.  So long as the licensee timely meets the

renewal requirements and none of the triggering events occurs, the issued license will continue to

be valid and effective -- i.e., a new license does not issue under 7 U.S.C. § 2133.

9 C.F.R. § 2.2(b), dealing with an "[a]pplication for license renewal," provides that

"APHIS will renew a license after the applicant certifies by signing the application form that, to

the best of the applicant's knowledge and belief, he or she is in compliance with the regulations

and standards and agrees to continue to comply with the regulations and standards."  9 C.F.R.

---

[2]     While § 2.3(a) requires that "[e]ach applicant must demonstrate" compliance and that "[e]ach applicant for an initial license or license renewal" make his or her premises "available for inspection," the regulation does not impose any obligation upon the agency, restrict the agency's authority to act, or require a demonstration of compliance or an inspection *prior to* issuing a license or renewing an issued license.  9 C.F.R. § 2.3(a).  Section 2.3(b), on the other hand, does require an inspection and a demonstration of compliance *prior to* the issuance of an initial license.  9 C.F.R. § 2.3(b).  There is no corresponding requirement for the renewal of an issued license found in the regulations.

§ 2.2(b).  The requirement of a signed and certified application is the first of three requirements

for renewal of an issued license contained within the regulations.  APHIS has not interpreted the

regulations as requiring the applicant to demonstrate compliance before APHIS renews his or her

license.  *See* Proposed Rule: Animal Welfare; Amendments to Licensing Provisions and to

Requirements for Dogs, 84 Fed. Reg. 10,721 (Mar. 22, 2019).

      9 C.F.R. § 2.6 requires the payment of an annual license fee.  The payment of the annual

license fee constitutes the second requirement for renewal of an issued license under the

regulations.

      9 C.F.R. § 2.7 provides that "[e]ach year, within 30 days prior to the expiration date of

his or her license, a licensee shall file with the AC Regional Director an application for license

renewal and annual report[.]"  9 C.F.R. § 2.7(a).  The submission of an annual report is the third

and final requirement for renewal of an issued license contained in the regulations.

      9 C.F.R. § 2.5(b) provides the procedure for license renewal and summarizes the above

listed requirements:

> (b) Any person who is licensed must file an application for a license
> renewal and an annual report form (APHIS Form 7003), as required
> by §2.7 of this part, and pay the required annual license fee. The
> required annual license fee must be received in the appropriate
> Animal Care regional office on or before the expiration date of the
> license or the license will expire and automatically terminate.
> Failure to comply with the annual reporting requirements or pay the
> required annual license fee on or before the expiration date of the
> license will result in automatic termination of the license.

9 C.F.R. § 2.5(b).  *See also* 9 C.F.R. § 2.1(d)(1) ("A licensee who wishes a renewal must submit

to the appropriate Animal Care regional office a completed application form and the annual

license fee indicated in §2.6 by certified check, cashier's check, personal check, money order, or

credit card. The application form and the annual license fee must be received by the appropriate

Animal Care regional office on or before the expiration date of the license.").  As with the rest of

the regulation, § 2.5(b) does not require a demonstration of compliance prior to renewal. Moreover, § 2.5(b) makes clear that the expiration of an issued license is not due to any finding of violation or non-compliance; rather, the license may expire automatically for failure to renew or meet the renewal requirements.

9 C.F.R. § 2.11 explicitly provides for when an initial license application may be denied, and, thereby, not issue.  Section 2.11 provides, in relevant part: "(a) A license will not be issued to any applicant who: (1) Has not complied with the requirements of §§ 2.1, 2.2, 2.3, and 2.4 and has not paid the fees indicated in § 2.6; [or] (2) Is not in compliance with any of the regulations or standards in this subchapter . . . ."  9 C.F.R. § 2.11(a).  Section 2.11 applies only to a "[d]enial of *initial license* application."  9 C.F.R. § 2.11 (emphasis added).

Section 2.12, on the other hand, provides that "[a] license may be terminated during the license renewal process or at any other time for any reason that an initial license application may be denied pursuant to § 2.11 after a hearing in accordance with the applicable rules of practice." 9 C.F.R. § 2.12.  Accordingly, once a license is issued, the only way it can be terminated or revoked for a violation of the AWA and the regulation promulgated thereunder is pursuant to the procedural protections afforded the licensee in § 2149 of the AWA.

## II.   THE USDA'S UPDATED REGULATORY SCHEME.

In May 2020, USDA amended the regulatory scheme to eliminate administrative renewals.  Specifically, APHIS published a final rule amending the AWA licensing regulations to, among other things, establish a firm expiration date for licenses after which the licensee would once again be required to affirmatively demonstrate compliance before obtaining another license.  *See* Animal Welfare; Procedures for Applying for Licenses and Renewals, 85 Fed. Reg. 28,772 (May 13, 2020).  The new rule provides that licenses are no longer renewable, and also

establishes regulatory compliance as a condition of all instances of licensure.  *Id.* at 28,779.  The new rule became effective on November 9, 2020, and will be implemented in phases.  The USDA has informed all of its current licensees of the schedule that these new regulations will begin to apply to them.  As relevant to this action, the new regulations will apply to Hampton's facility beginning in 2023.

## III.   PROCEDURAL HISTORY.

On May 29, 2020, the Court denied Defendants' motion to dismiss in part.  *See* Mem. Op. at 22.  First, the Court concluded that PETA had "satisfie[d] the requirements for organizational standing and may challenge the USDA's renewal decisions."  *Id.* at 12.  Next, the Court rejected Defendants' argument that collateral estoppel precluded judicial review of the license renewal scheme "[b]ecause the D.C. Circuit has held that in these 'smoking gun' cases the District Court must evaluate the individual renewal decisions[.]"  *Id.* at 17.  The Court also dismissed as moot PETA's claim against Deer Haven, which had voluntarily given up its exhibitor license and closed, *id.* at 18-19.  Finally, the Court declined to join the remaining USDA's licensees under Federal Rule of Civil Procedure ("Rule") 19 to this action, *id.* at 21.

Subsequently, PETA amended its complaint to, among other things, add claims related to the most recent license renewals issued by USDA.  PETA's complaint now challenges USDA's decisions to renew licenses for four animal exhibitors located in five states: (1) The Camel Farm in Yuma, Arizona; (2) Laughing Valley Ranch in Idaho Springs, Colorado; (3) Henry Hampton; and (4) Wilson's Wild Animal Park in Winchester, Virginia.  *See* 2d Am. Compl. ¶ 1.  Since the filing of PETA's amended complaint, all of the licensees (except for Henry Hampton) have either expired or have been revoked by the USDA.  Therefore, those claims have either been dismissed or, in the case of Laughing Valley, is pending dismissal before the Court.

On August 14, 2020, Defendants moved for a voluntary remand to reconsider its renewal decision with respect to the licensees challenged in this action, *see* ECF No. 30, which PETA opposed, *see* ECF No. 31. The Court denied Defendants motion, *see* Order (ECF No. 35), and ordered the Parties to brief the merits of this matter.

On December 28, 2020, PETA moved for summary judgment with respect to its claim against Henry Hampton, *see* ECF No. 40.

## IV.   USDA'S LICENSING OF HENRY HAMPTON'S FACILITIES.

Henry Hampton currently operates two facilitates under a single USDA exhibitor license: (1) the Lazy 5 Ranch in Mooresville, North Carolina; and (2) The Farm at Walnut Creek in Sugarcreek, Ohio. On August 14, 2020, USDA renewed Hampton's license upon the expiration of his prior renewal issued on August 13, 2019 (*see* Administrative Record ("AR") 0564). Previously, USDA has issued Hampton annual license renewals. *See, e.g.*, AR 558, 560, 562.

### a.   USDA's Recent Inspections of Hampton's Facilities.

USDA has inspected Mr. Hampton's facilities a total of seven times after October 2018. Most recently, USDA inspectors conducted inspections at both of Hampton's facilities on August 13, 2020, and cited Hampton for allowing unsupervised public feeding of animals and unsafe fencing. *See* AR 682-97; AR 796-809. Hampton appealed those inspection reports, *see* AR 698, 804, which USDA considered and later upheld in a letter dated October 2, 2020. *See* AR 4531.

Prior to the 2020 inspections and after October 2018, USDA inspected Hampton a total of five times; three inspections at Lazy 5 Ranch (*see* AR 0776, 0780, 0792) and two inspections at The Farm at Walnut Creek (*see* AR 0673, 0677). Four of the inspections resulted in no noncompliances ("NCIs") cited on the inspection reports. In 2019, USDA did not cite any non-

compliant items on its inspection report for its inspection of Lazy 5 Ranch on September 25, 2019, *see* AR 792, and cited only one non-critical non-compliant item[3] (*i.e.*, sanitation) on the inspection report for June 26, 2019 (AR 780).  In addition, APHIS did not cite any non-compliant items on its inspection report for its recent inspection of the Farm at Walnut Creek on June 27, 2019 (AR 0677).

### b.   USDA's Recent Enforcement Action Regarding Hampton.

In September 2018, APHIS filed an administrative enforcement complaint against Henry Hampton for alleged violations of AWA regulations occurring at Lazy 5 Ranch and The Farm at Walnut Creek, ranging in time from October 22, 2013 to December 4, 2017.  AR 1190-1200. The complaint alleged violations dating between October 22, 2013, and December 4, 2017.  *Id.* The parties ultimately settled the proceeding via a Consent Decision and Order, which the Administrative Law Judge ("ALJ") issued on March 4, 2019.  AR 1203-05.  The Order directed Henry Hampton to cease and desist from violating the AWA and its regulations, and assessed a civil penalty of $20,000.  AR 1205.

If Hampton knowingly violates the cease and desist Order, there are serious repercussions.  After being afforded notice and the opportunity for hearing, if an ALJ finds that Hampton knowingly fails to obey the cease and desist Order, Hampton could be assessed a civil penalty of $1,782 for each offense, with each day counting as a separate offense.  7 U.S.C. § 2149(b); 7 C.F.R. § 3.91(b)(2)(i).

---

[3]     As discussed in USDA's Animal Care Inspection Guide (updated in March 2020), critical noncompliances include noncompliances "that had a serious or severe adverse effect on the health and well-being of the animal." AR 3256. Non-critical noncompliances are less severe.

## LEGAL STANDARDS

### I.   JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT.

The APA requires courts to "hold unlawful and set aside" an agency's action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  When assessing an agency action, the district court asks whether the agency action "was reasonable and reasonably explained," not whether it agrees with the agency action or would have acted differently.  *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015).

## ARGUMENT

PETA challenges USDA's license renewal for Henry Hampton for the Lazy 5 Ranch in Mooresville, North Carolina and the Farm at Walnut Creek in Sugarcreek, Ohio, as arbitrary and capricious under the APA.  *See* 2d Am. Compl. ¶¶ 111-46; Pl.'s Mem. at 18-22.  As discussed below, USDA's renewal of Hampton's license was not arbitrary and capricious because the agency's reliance on its ministerial renewal scheme was reasonable and USDA's most recent renewal in 2020 is not undermined by any so-called "smoking gun" evidence.  Moreover, USDA reviewed Hampton's record prior to renewal and decided that issuing the renewal was

appropriate.  Finally, USDA did not abuse its discretion in waiving the timeliness requirement for Hampton's license renewal.

## I.     USDA'S RENEWAL OF HAMPTON'S LICENSE WAS NOT ARBITRARY AND CAPRICIOUS.

USDA's most recent renewal of Hampton's license in 2020 was not arbitrary and capricious under the APA because the renewal (1) was consistent with the USDA's ministerial license renewal scheme; (2) did not ignore any "smoking gun" evidence alleged by PETA; and (3) demonstrates reasoned decisionmaking.

### a.   Hampton's Renewal Was Consistent With USDA's Ministerial License Renewal Scheme.

As an initial matter, USDA's 2020 renewal of Hampton's license is consistent with the agency's administrative renewal scheme.  To obtain a license renewal under USDA's prior regulations (which still apply here), an applicant must satisfy three administrative requirements promulgated by the USDA: (1) file an annual report indicating the number of exhibited animals the applicant owns or leases, *see* 9 C.F.R. § 2.7(a), (d); (2) pay an annual license fee, *see id.* § 2.1(d)(1); and (3) certify "by signing the application form that, to the best of the [applicants'] knowledge and belief, [they are] in compliance with the regulations and agree[ ] to continue" to so comply, *id.* § 2.2(b).  Here, there is no dispute that Hampton complied with all three of these requirements.

As noted above, USDA does not equate an applicant's compliance certification for a license renewal with the regulatory requirement for a license applicant to demonstrate compliance before receiving an initial license.  *See* Proposed Rule: Animal Welfare; Amendments to Licensing Provisions and to Requirements for Dogs, 84 Fed. Reg. 10,721 (Mar. 22, 2019).  Although PETA may object to USDA's administrative renewal process, it facilitates

the USDA's goal of ensuring humane care and treatment of animals in two important ways. First, it provides the USDA with up-to-date record keeping and accounting of AWA licensees. Second, it allows the agency to ensure compliance through random, unannounced inspections (as opposed to annual inspections tied to a renewal process). Indeed, USDA has expressly found that this system is more effective at ensuring compliance: "Enforcement of the AWA is based on random, unannounced inspections to determine compliance. . . . This cooperative system has been more effective than enforcement actions for each citation." 69 Fed. Reg. at 42094.

USDA has consistently applied this construction of the AWA as early as 1995, when the agency amended the regulations to add the certification requirement. *See* 60 Fed. Reg. at 1389 ("The proposed certification requirement was not presented as an alternative means of ascertaining compliance or as a substitute for inspections."); *id.* ("[T]he regulations make no provision for the denial of a license renewal as long as the licensee filed an application for license renewal on time, submitted an annual report as required by § 2.7, and has paid the required fees."). USDA has maintained a consistent position ever since.

Here, USDA reasonably relied on its licensing scheme in renewing the license for Hampton's facilities. As noted, USDA relies upon its inspection and enforcement actions to ensure compliance. That process, among other things, ensures that the licensees are provided with the right to request a hearing and challenge USDA's inspection findings regarding alleged violations of AWA regulations. Except to note Hampton's untimeliness in submitting his renewal application (which Defendants discuss *infra*), PETA does not argue that Henry Hampton failed to meet any of the regulatory requirements to obtain a renewed license. *See generally* Pl.'s Mem. Rather, PETA argues that USDA "disregards all evidence before it that demonstrates an

applicant's certification is demonstrably false." *Id.* at 18.  As discussed below, PETA's argument lacks merit.

### b.   USDA Did Not Ignore Any Alleged "Smoking Gun" Evidence.

Notwithstanding Hampton's compliance with the regulatory scheme, PETA correctly notes that the D.C. Circuit has held that such compliance "does not shield each agency action taken under the scheme from arbitrary and capricious review" under the APA.  *See ALDF*, 872 F.3d at 619.  Specifically, the Court in *ALDF* noted that "an agency's decision is arbitrary and capricious when its 'explanation for its decision . . . runs counter to the evidence before the agency.'"  *Id.* (citing *State Farm*, 463 U.S. at 43).  Here, PETA points to two categories of evidence it argues are contrary to USDA's renewal decisions: (1) USDA's inspection reports; and (2) public complaints.  However, neither of these sources demonstrate that USDA was aware of any verified evidence of AWA violations when it issued its most recent renewal of Hampton's license.  Defendants address each of these categories, in turn, below.

### i.   *USDA Inspection Reports.*

First, PETA argues that USDA has "continue[d] to disregard 'smoking gun' evidence of noncompliance" when renewing Hampton's license.  Pl.'s Mem. at 18.  Specifically, PETA argues that USDA's renewals of Hampton's facilities in 2016, 2017, and 2018, ignored inspections citing Hampton for the use of a chemical restraint drug.  *See id.* at 19 (citing AR 948).  However, PETA's complaint makes clear that the requested relief in this action is limited to USDA's most recent renewal of each of the challenged facilities.  *See* 2d Am. Compl. at 45 (requesting this Court to "set aside as unlawful the USDA's *most recent decisions* to renew the licenses of . . . Henry Hampton[.]" (emphasis added)).

As noted, USDA renewed Hampton's license most recently on August 14, 2020. Defendants submit that any prior renewals are now moot and, therefore, the Court need not consider them in resolving the parties' cross-motions for summary judgment.  *See Animal Legal Def. Fund v. Vilsack*, 110 F. Supp. 3d 157, 161 (D.D.C. 2015) (declining to consider prior licensing decisions and observing that "[b]ecause the 2014 licensing decision is the only discrete agency action challenged in the complaint to which it appears that a challenge is not moot, the Court presumes, for the sake of resolving this motion, that the relevant decision forming the basis of the administrative record is the 2014 licensing decision").[4]  As a result, the only question before the Court is whether USDA's most recent renewal for Hampton's license on August 14, 2020, *see* AR 0566, must be set aside as arbitrary and capricious.

As relevant to USDA's most recent renewal decision regarding Hampton, PETA concedes that USDA's only inspection of the Walnut Creek facility during the prior year did not identify *any* violations of the AWA.  *See* Pl.'s Mem. at 13 (citing AR 677).  Further, PETA acknowledges that USDA's two inspections at the Lazy 5 Ranch facility found only one non-critical noncompliance.  *Id.* (citing AR 783); *see also* AR 569 (characterizing the noncompliance as non-critical).  That finding cannot possibly rise to the level of "smoking gun" evidence requiring USDA to decline to renew Hampton's license.

Indeed, the noncompliance noted by USDA at the Lazy 5 Ranch was relatively minor. USDA regulations provide that premises "shall be kept clean and in good repair in order to

---

[4]       The inclusion of USDA's prior renewals in the Administrative Record does not mandate a contrary conclusion, as Defendants included such records as background information based on the specific allegations in PETA's complaint related to USDA's inspection of Henry Hampton's facilities and to assist in the understanding of USDA's renewal licensing scheme.  *See ALDF*, 872 F.3d at 620 (noting that a district court may consider "background information" as part of the Administrative Record).

protect the animals from injury[.]"  9 C.F.R. § 3.131(c).  USDA's June 26, 2019, inspection report cited the facility for noncompliance of this requirement due to the fact that there was a large pile of old horseshoes inside an enclosure holding Angora goats, which posed a potential injury hazard to the animals in the pen.  *See* AR 780.  PETA offers no explanation for how this single citation constitutes "smoking gun" evidence of non-compliance sufficient to preclude Hampton's renewal.  Nor does PETA argue that it shows that Hampton's subsequent self-certification was "demonstrably false," *see* Pl.'s Mem. at 21.  Nor would any such argument be persuasive because the facility promptly corrected the issue at the time of inspection.  *See* AR 780.  Moreover, USDA acknowledged and considered this minor citation in a memorandum authored shortly before Hampton's 2020 renewal, which USDA expressly noted would not preclude a potential renewal.  *See* AR 569.

Perhaps realizing that USDA's inspection reports prior to Hampton's 2020 renewal provide an entirely inadequate basis to support the invalidation of Hampton's license, PETA pivots to take aim at USDA's inspections of Hampton's facilities on August 13, 2020—the day before Hampton's license was renewed.  *See* Pl.'s Mem. at 19.  As a result of those inspections, USDA inspectors cited Hampton for allowing unsupervised public feeding of animals and for unsafe fencing.  AR 0682-0697; AR 0796-0809.  Although this occurred nearly contemporaneously with USDA's renewal action, PETA entirely ignores the fact that Hampton appealed those inspection reports.  AR 0698; AR 0804.  An appeal is a request made by a licensee to reconsider all or part of the content of an inspection report.  *See* AR 3268.[5]  The appeals process provides an avenue for USDA to review any disagreements involving the

---

[5]     *See also* USDA's "Tech Note" regarding the inspection appeal process at https://www.aphis.usda.gov/publications/animal_welfare/2017/AC-Tech-Note-Inspection-Report-Appeals-Process.pdf (last visited Jan. 26, 2021).

content of an inspection report, whereby a licensee may challenge the content of an inspection report that the licensee believes to be incorrect, fails to consider relevant facts, or is inconsistent with the applicable AWA regulations or standards.  If a question involves potential changes to the content of the inspection report, the inspector may modify the inspection report or leave it as originally written, as appropriate.

USDA did not resolve Hampton's appeal until October 2, 2020, nearly two months after Hampton's license renewal.  AR 4531.  In the interim, USDA reviewed the inspection reports via an appeal panel consisting of two USDA Animal Care Specialists and USDA's Director of Animal Welfare Operations.  *Id.*  The panel ultimately upheld the inspection reports "as written" and specifically noted that the panel's decision represented the "final determination" regarding the inspection reports.  *Id.*

Here, because the final decision regarding the 2020 inspection report occurred after USDA's renewal of Hampton's license, it was reasonable for the agency to decline to consider the citations in that inspection report as part of its renewal decision.  To give the appeal process any meaning, USDA must give its licensees an opportunity to provide relevant facts or correct potentially inaccurate information.  This inevitably takes some time (in this case, almost two months).  Accordingly, although USDA renewed Hampton's license, USDA may still take action regarding the recently-issued citations as part of its enforcement process.

### ii.  Public Complaints.

PETA also argues that USDA ignored "apparent violations" documented by PETA and submitted to the USDA.  *See* Pl.'s Mem. at 19.  Like any interested member of the public, PETA may notify USDA of apparent violations of the AWA.  *See* 7 C.F.R. § 1.133; *see also* AR 3347-78 (describing the public complaint process).  Upon receipt of the information and supporting

evidence, the agency will begin an investigation as, in the opinion of the Administrator, is justified by the facts. 7 C.F.R. § 1.133(a)(3); *see also id.* § 2146(a) (giving the USDA discretion to investigate or inspect licensees as it deems necessary).  The agency has the discretion whether to file a complaint initiating an enforcement or termination proceeding.  7 C.F.R. § 1.133(b).

In practice, APHIS receives mail, email, and telephone communications from members of the public regarding enforcement of the Animal Welfare Act, including issues of animal health and welfare that APHIS has or has not taken.  APHIS designates these communications as public complaints and documents them for review, which determines whether or not they contain evidence of noncompliance with the Animal Welfare Act or USDA's regulations.  *See, e.g.*, AR 1043 (documenting PETA's complaint and responding to it).

In August 2020, USDA received two complaints from PETA alleging various potential AWA violations at Hampton's facilities.  *See* AR 4280 (August 3, 2020); AR 4506 (July 16, 2020).  While PETA argues that violations have persisted at Hampton's facilities, Hampton had only been cited for one, noncritical non-compliance (which was corrected at the time of inspection) after October 2018.  Additionally, PETA's only alleged violations of a repetitive nature involve public interaction with animals (Lazy 5 Ranch) and inadequate shading for giraffes (The Farm at Walnut Creek).  As discussed above, USDA inspected Hampton's facilities on August 13, 2020, and finalized those inspection reports on October 2, 2020.  Accordingly, in light of Hampton's renewal in August 2020, USDA will take further action as it deems appropriate, to include the potential for enforcement action and continued random inspections at Hampton's facilities to further assess the authenticity and validity of the allegations in PETA's complaint.

To the extent that PETA challenges USDA's decisions to conduct random inspections or issue enforcement actions, judicial review of such actions is effectively foreclosed.  Indeed, the Supreme Court has recognized that certain categories of administrative decisions, including refusals to take enforcement actions, are presumptively outside the bounds of judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831-34 (1985); *see Drake v. FAA*, 291 F.3d 59, 70-71 (D.C. Cir. 2002) (FAA's decision to dismiss complaint without a hearing—a prerequisite for any finding of a violation had occurred—was equivalent to a decision not to commence an enforcement action).  The AWA states that the Secretary of Agriculture "shall make such investigations or inspections *as he deems necessary* to determine whether any [exhibitor] . . . has violated or is violating any provision of this chapter or any regulation or standard issued thereunder."  7 U.S.C. § 2146 (emphasis added).  As another court in this district previously concluded, this language "strongly suggests that its implementation was 'committed to agency discretion by law,'" *see PETA v. USDA*, 7 F. Supp. 3d 1, 11 (D.D.C. 2013) (quoting *Webster v. Doe*, 486 U.S. 592, 600 (1988) (internal quotation omitted)); therefore, such claims are barred from judicial review, *id.*; *see* 5 U.S.C. § 701(a)(2).

To date, USDA has determined that no inspection or enforcement actions are necessary based on the allegations stated in PETA's complaints.  The USDA's action (or inaction) in this regard is thus analogous to an exercise of "prosecutorial discretion" of the sort discussed in *Chaney*.  And, as *Chaney* makes clear, when prosecutorial discretion is at issue, the matter is presumptively committed to agency discretion by law.  *See Block v. SEC*, 50 F.3d 1078, 1082 (D.C. Cir. 1995) (concluding that an agency's refusal to hold a hearing for the purpose of establishing the factual basis for subsequent enforcement action is subject to Chaney's presumption against judicial review).

As noted above, USDA relies on its enforcement program to ensure AWA compliance. Under this program, USDA recently entered into a Consent Decision and Order with Hampton. If Hampton knowingly violates the cease and desist Order, there are serious repercussions.  After being afforded notice and the opportunity for hearing, if an ALJ finds that Mr. Hampton knowingly fails to obey the cease and desist Order, Mr. Hampton could be assessed a civil penalty of $1,782 for each offense, with each day counting as a separate offense.  7 U.S.C. § 2149(b); 7 C.F.R. § 3.91(b)(2)(i).  And, as discussed above, this adjudicatory process balances Hampton's right to due process with USDA's mission to ensure the humane treatment of animals.

In sum, USDA did not ignore any contrary evidence regarding Hampton's compliance when it issued Hampton a license renewal in August 2020.  Between October 2018 and August 13, 2020, Hampton had only been cited for a single non-critical noncompliance for a sanitation issue, which was immediately corrected.  And although PETA had complained about other possible violations in 2020, USDA did not complete its review of Hampton's facilities until its most recent inspection reports became final on October 2, 2020, subsequent to Hampton's renewal.  Therefore, because those issues are properly addressed outside of the prior renewal proceeding, it was reasonable for USDA to set aside those inspection reports in making its renewal decision in August 2020.

To be sure, PETA has entirely failed to demonstrate that Hampton's 2020 self-certification was "false."  While it is true that"[r]eliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking," *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003), USDA did not rely on any falsehood here.  Indeed, in the *Missouri* case, the D.C. Circuit concluded that when FERC

announced that the existing rates for natural gas transportation were "necessary" to prevent adverse consequences (including a "financial disaster"), it "knew full well that there was *no* possibility that either event could occur."  *Id.* at 1076 (emphasis in original).  While PETA is correct that USDA's inspections around the same time of Hampton's recent renewal revealed some violations of USDA's regulations, that process had not yet reached its logical conclusion at the time of the renewal.  USDA cannot be forced to assume the veracity of its inspection reports until the appeals process—which is a critical component of USDA's inspection program—concludes.

For similar reasons, USDA cannot assume the truth of the public complaints it receives. Rather, USDA considers those complaints when making its discretionary decisions as to when to conduct inspection activities and bring subsequent enforcement actions based on any potential violations of AWA regulations.  This makes sense because, in order to potentially invalidate a particular license, a third-party such as PETA could merely submit evidence of a possible violation immediately prior to the licensee's renewal deadline without the opportunity for USDA to properly review that evidence and verify the potential violation.  Such a perverse incentive would undoubtedly rob USDA's licensees of any required due process.  For this reason, among others, USDA relies on its inspection and enforcement processes—and not its renewal process—to ensure compliance in AWA requirements.  As relevant here, USDA may inspect Hampton's facilities or initiate an enforcement action at any time to address noncompliant items, during which the agency will remain duty-bound to afford Hampton appropriate due process.

### c.   USDA's Renewal Resulted From Reasoned Decisionmaking.

Not only was USDA's renewal rational and consistent with its ministerial renewal process, but in this instance Animal Care took the further step of reviewing Hampton's

compliance history prior to renewing his license.  As PETA acknowledges (*see* Pl.s Mem. at 21),

prior to renewing Hampton's license, USDA reviewed Hampton's record—including USDA's

prior enforcement action and the various inspection reports and complaints discussed above—

and authored a Memorandum to File reasoning that, in consideration of the complete and current

record, Hampton remained eligible for a renewed license if he met the administrative renewal

requirements.  AR 569.  Accordingly, the Administrative Record in this case sufficiently

demonstrates that USDA duly considered and evaluated Hampton's record prior to renewing his

license.  As demonstrated above, USDA was simply not in the position to conclude that

Hampton's self-certification was "false" or that Hampton's record otherwise warranted the

severe action of denying his license renewal.  Therefore, not only was USDA's decision rational,

but it also demonstrates that the agency engaged in "reasoned decisionmaking" when it

ultimately renewed Hampton's license in 2020, *see ALDF*, 872 F.3d at 620; *see State Farm*, 463

U.S. at 52.  Accordingly, USDA's renewal decision was not arbitrary and capricious.

## II.    USDA REASONABLY WAIVED TIMELINESS REQIUREMENTS FOR LICENSE RENEWALS DURING THE PANDEMIC.

PETA's final argument in seeking to invalidate Hampton's license focuses on the

timeliness of Hampton's 2020 renewal application.  PETA notes that Hampton's 2019 license

was scheduled to expire on August 13, 2020.  *See* Pl.'s Mem. at 20.  Hampton, however, did not

submit his renewal application until August 14, 2020.  *Id.* (citing AR 568).  Thus, PETA argues

that Hampton was ineligible for a renewed license after August 13th and that USDA should have

required him to instead seek an initial license (which, as noted above, requires a demonstration

of compliance of AWA requirements).  *See id.* at 21.

Defendants do not dispute that Hampton's license was a day late.  An application to

renew a license and the annual license fee must be received by USDA "on or before the

expiration date of the license," *see* 9 C.F.R. § 2.1(d)(1).  However, as explained below, USDA reasonably waived its timeliness requirement due to the substantial impacts of the ongoing COVID-19 pandemic on agency renewal operations.

An agency's grant or denial of a waiver of its regulations is reviewed for abuse of discretion.  *See Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 238 (D.C. Cir. 1985). Where a "rule governs information that the agency requires before it will consider a filing by one it regulates, courts have been especially apt to allow agencies much leeway in granting waivers to their own rules."  *Neighborhood TV Co., Inc. v. FCC*, 742 F.2d 629, 636 (D.C. Cir. 1984). There is a "general principle that '[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business when in a given case the ends of justice require it.'"  *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (quoting *NLRB v. Monsanto Chem. Co.*, 205 F.2d 763, 764 (8th Cir. 1953).  "Whether or not [the agency's] discretion has been soundly exercised will, of course, depend on the circumstances of the case as reviewed by [the agency]."  *Mun. Elec. Util. Ass'n of Alabama v. Fed. Power Comm'n*, 485 F.2d 967, 973 (D.C. Cir. 1973); *see id.* at 973 n. 23  (filing rules are "'mere aids to the exercise of the agency's independent discretion'" and in both language and purpose leave room for doctrine of substantial or reasonable compliance).

As explained by Elizabeth Goldentyer, D.V.M., USDA's Deputy Administrator for APHIS's Animal Care program, the COVID-19 pandemic has impacted the agency's longstanding practice of mailing license renewal packets to licensees in advance of licensees'

expiration dates.  Goldentyer Decl. (attached hereto) ¶ 3.[6]  Those packets are usually tailored for

each licensee (to assist USDA in identifying any change in address, etc.) and mailed out six

weeks in advance of the renewal date.  *Id.* ¶¶ 3-4.  Specifically, USDA was unable to mail any

renewal packets to licensees with expiration dates occurring in May through September 2020

(like Hampton's).  *Id.* ¶ 4.  Because of these issues, USDA did not terminate any licenses for

untimely renewal applications unless it was clear that the licensee was no longer in business.  *Id.*

¶ 5.

　　　　　According to Dr. Goldentyer, USDA's waiver of its renewal timeframes was necessary

because wide scale terminations would have a significant detrimental effect on USDA's

operations and the licensed community.  *Id.*  To wit, she explains that large scale terminations

due to the COVID-19 pandemic would have irreparably harmed animals, businesses and the

agency.  *Id.*  As one example regarding the potential impact on the licensed community, she

explains that terminations would interfere with animal management because licensees could lose

income used to provide food, care, and shelter for the animals, which may create an animal

welfare risk.  *Id.*  As for USDA's operations, Dr. Goldentyer notes that USDA would also be

impacted by the sudden need to complete pre-licensing inspections due to the expected volume

---

[6]      Defendants submit Dr. Goldentyer's declaration to supplement the Administrative Record, which does not speak to USDA's waiver of timeliness requirements due to the pandemic.  PETA's timeliness argument was made for the first time in this litigation in its summary judgment motion, and is otherwise absent from the complaint and, therefore, was not considered in developing the Administrative Record.  When that record fails to adequately explain the challenged action, a court may also consider agency affidavits or testimony representing a "contemporaneous explanation of the agency decision."  *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973); *see also Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) ("[T]here is nothing improper in receiving declarations that 'merely illuminate reasons obscured but implicit in the administrative record.'"); *Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (stating that if an agency's explanation for action is insufficient, the case can be remanded to the agency for further explanation).

of businesses applying for initial licensees at once, to say nothing of the significant logistical and safety challenges caused by the COVID-19 pandemic.  *Id.*

Accordingly, as early as March 2020, Dr. Goldentyer assured the regulated community that, during the pandemic, licensees would remain in effect regardless of whether a licensee had trouble getting the application submitted to USDA or whether USDA had trouble accessing the application due to mail pileups while USDA employees were out of the office as part of the agency's response to the pandemic.  *Id.* ¶¶ 5, 7.

In this case, it was not until August 13, 2020, that USDA identified Hampton as one of the licensees who had not yet submitted a renewal application.  *Id.* ¶ 12.  On August 14, 2020, Animal Care called Mr. Hampton to confirm that he had not mailed a renewal application.  *Id.* In response, Mr. Hampton informed USDA that his staff was waiting for a renewal packet from Animal Care and due to this, they did not submit the application on time.  *Id.*  Because of the aforementioned waiver policy, USDA immediately emailed Mr. Hampton's office a copy of his renewal packet, which he completed and returned on the same day.  *Id.*

Under these circumstances, the Court should afford USDA some leeway in its review of whether its decision to grant a waiver was arbitrary and capricious, as alleged by PETA.  *See Neighborhood TV Co., Inc.*, 742 F.2d at 636.  Given the significant disruptions to both the agency and regulated community, permitting a one day extension without terminating Hampton's license and requiring Hampton to reapply was not unreasonable.[7]

\*      \*      \*

---

[7]      Even were the Court to disagree, it should decline to vacate Hampton's license on this basis.  Although remand without vacatur remains an exceptional remedy, the D.C. Circuit has held that it is appropriate when vacatur would disrupt settled transactions.  *See Milk Train Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (collecting cases).

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant Defendants'

motion for summary judgment and deny PETA's motion for summary judgment.


Dated January 27, 2021         Respectfully submitted,

                                     MICHAEL R. SHERWIN
                                     Acting United States Attorney

                                     BRIAN P. HUDAK
                                     Acting Chief, Civil Division

                                     /s/   *Christopher C. Hair*
                                     CHRISTOPHER C. HAIR, PA Bar No. 306656
                                     Assistant United States Attorney
                                     555 Fourth Street, N.W.
                                     Washington, D.C. 20530
                                     (202) 252-2541
                                     Christopher.Hair@usdoj.gov

                                     *Counsel for Defendants*